# United States Court of Appeals for the Federal Circuit

———————————

**JACK LADD, JOBETH LADD, JOHN LADD, MARIE LADD,
GAIL A. LANHAM, JAMES A. LINDSEY, MICHAEL A. LINDSEY,
WILLIAM LINDSEY, CHARLIE MILLER, PAULINE MILLER,
AND RAYMOND MILLER,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

———————————

2010-5010

———————————

Appeal from the United States Court of Federal Claims in case No. 07-CV-271, Senior Judge Robert H. Hodges, Jr.

———————————

Decided: December 14, 2010

———————————

MARK F. (THOR) HEARNE, II, Arent Fox LLP, of Clayton, Missouri agued for plaintiffs-appellants. With him on the brief were LINDSAY S.C. BRINTON and MEGHAN S. LARGENT.

JAMES D. GETTE, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, for defendant-appellee. With him on the brief was IGNACIA S. MORENO, Assistant Attorney General.

GREG REILLY, Morrison & Foerster LLP, of San Diego, California, for amicus curiae. With him on the brief was SARAH SIMMONS, of Chiyoda-ku, Tokyo Japan. Of counsel was ANDREA C. FERSTER, Rails-To-Trails Conservancy, of Washington, DC.

_____

Before RADER, *Chief Judge*, LINN and MOORE, *Circuit Judges.*

MOORE, *Circuit Judge.*

The appellants appeal an order of the Court of Federal Claims granting summary judgment that no compensable taking occurred when the Department of Transportation's Surface Transportation Board (STB) issued a Notice of Interim Trail Use or Abandonment concerning an easement over the appellants' land. Because the court's order conflicts with *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2005) and *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006), we reverse.

BACKGROUND

The appellants own land in Cochise County, Arizona near the United States-Mexico border. In 1903, the El Paso & Southwestern Railroad Company (El Paso) acquired the right to use a 100-feet wide, 76.2-mile long strip of land to build and operate a railroad, pursuant to the General Railroad Right-of-Way Act of 1875, 43 U.S.C.

§§ 934-39 (1875 Act), and various private conveyances. According to the appellants, they retained fee simple estates in the portions of their land underlying the railway.

In 2003, the San Pedro Railroad Operating Company, LLC (San Pedro) acquired the El Paso's rights to the railway. At that time, the railway served one principal shipper, the Chemical Lime Company. San Pedro intended to restore a connection with the Mexico rail service at Naco, Arizona, but the plan never materialized. Thus, in 2005, San Pedro initiated proceedings to abandon all 76.2 miles of the railway by filing a petition with the STB under 49 U.S.C. § 10502 seeking exemption from the requirements of 49 U.S.C. § 10903. As explained by the STB, when such a "petition becomes effective, the railroad will be able to salvage track, ties, and other railroad appurtenances and dispose of the right-of-way." STB Docket No. AB-1081X, D.I. 35-9, 1 (Nov. 9, 2005). Over an objection from the Chemical Lime Company, the STB granted San Pedro's petition and instructed San Pedro to file a notice of consummation to signify that it had exercised its authority to fully abandon its railway line. *Id.* at 7; *see also* 49 C.F.R. § 1152.29(e)(2).

The Trust for Public Land (Trust), a charity supporting the conversion of abandoned rail lines to public recreational trails, asked the STB to issue a Notice of Interim Trail Use or Abandonment (NITU) pursuant to § 8(d) of the National Trails System Act Amendments of 1983 (Trails Act). *See* 16 U.S.C. § 1247(d). San Pedro indicated its willingness to enter into trail use negotiations with the Trust, and on July 25, 2006, the STB issued a NITU, suspending abandonment proceedings and authorizing a 180-day period for San Pedro and the Trust to negotiate a trail use agreement. STB Docket No. AB-

1081X, D.I. 35-10, 2 (Jul. 25, 2006). The Trust requested a 30-day extension of the negotiating period of the NITU for a portion of the railway line, specifically, a segment running from Highway 92 to Curtiss Flats (the Northern Stretch). Thus for this segment, the negotiating period lasted 210 days. The STB indicated that San Pedro's abandonment exemption would become effective subject to the NITU (and other standard conditions, not relevant here). The STB further stated that if no trail use agreement was reached, San Pedro could fully abandon its railway line. *Id.* at 3. Shortly after the STB issued the NITU, San Pedro removed its rails and ties from the land.

The Trust and San Pedro did not reach a trail use agreement. On January 29, 2007, San Pedro filed a notice of consummation informing the STB that it had abandoned the portion of the railway line east of Naco, Arizona (the Southern Stretch). *See* 49 C.F.R. § 1152.29(e)(2).[1] For the remainder of the line, San Pedro filed, and the STB granted, several requests to postpone the deadline to consummate abandonment. *See, e.g.*, STB Docket No. 1081X (Jun. 8, 2007). The current deadline for San Pedro to consummate abandonment is July 26, 2011. STB Docket No. 1081X (May 14, 2010).

Although the Northern Stretch of the rail corridor no longer serves as a railway, no public trail has been estab-

---

[1]    This regulation provides that "[a] railroad that receives authority from the Board to abandon a line (in a regulated abandonment proceeding under 49 U.S.C. § 10903, or by individual or class exemption issued under 49 U.S.C. § 10502) shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line (e.g., discontinued operations, salvaged the track, canceled tariffs, and intends that the property be removed from the interstate rail network)." 49 C.F.R. § 1152.29(e)(2).

lished. According to the appellants, this corridor provides a convenient route to enter the United States from Mexico, and it is now used by illegal aliens and drug smugglers and patrolled by the U.S. Border Patrol. The appellants further state that they have tried to "fence and build barriers across the abandoned rail line but the Border Patrol and trespassers continue to cut the fence and remove the barriers." Appellants' Br. at 10.

The appellants brought suit against the United States in the Court of Federal Claims alleging a violation of the takings clause of the Fifth Amendment to the United States Constitution. The appellants alleged, among other things, that the NITU had forestalled or taken their state law reversionary property interests. J.A. 65. The appellants further alleged that pursuant to *Caldwell*, 391 F.3d 1226, and *Barclay*, 443 F.3d 1368, a taking of their property occurred when the STB issued the NITU on July 25, 2006. J.A. 66.

The Court of Federal Claims concluded that no taking had occurred and dismissed the case. *Ladd v. United States*, 90 Fed. Cl. 221, 228 (2009). The court determined that "[a] physical taking cannot have occurred in these circumstances, where neither the NITU nor another aspect of the federal abandonment process has resulted in the construction of a trail for public use." *Id.* at 226. The court further stated that "[i]ssuance of a NITU cannot be a physical taking where the landowners have not suffered a physical invasion of the property in which they claim interests." *Id.* The court explained that "[c]onversion of a railroad right-of-way to a public trail has been the physical invasion necessary to finding takings in earlier Rails-to-Trails cases," citing *Barclay*, 443 F.3d at 1372, *Caldwell*, 391 F.3d at 1228, and *Preseault v. International Commerce Commission*, 100 F.3d 1525, 1551-52 (Fed. Cir.

1996) (en banc). *Id.* at 227. The court held that unlike *Preseault*, *Caldwell*, and *Barclay*, in this case, a trail has not yet been established. *Id.* The court stated that the rail corridor remained with the railroad, and thus "[t]he railroad holds the key to completing the regulatory abandonment process. The NITU has not effected a change of status in plaintiffs' property interests." *Id.* The court acknowledged that "*Caldwell* and *Barclay* suggest that temporary takings could occur in some circumstances, but those cases addressed applicable statutes of limitations for takings in this court." *Id.* The court concluded that a "physical presence by the general public, made possible by government action, is the crucial element so far missing from this case." *Id.*

The landowners appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

### DISCUSSION

We review the court's grant of summary judgment *de novo*. *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed. Cir. 2008). Summary judgment is appropriate where the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ct. Fed. Cl. R. 56(c). The issue of whether a taking has occurred is a question of law, reviewed *de novo*, with factual underpinnings, which we review for clear error. *Casitas*, 543 F.3d at 1283.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. "The Amendment does not prohibit the taking of private property, but instead places a condition on the exercise of that

power." *Preseault v. Int'l Commerce Comm'n*, 494 U.S. 1, 11 (1990) (citation and quotation marks omitted). "The Supreme Court has emphasized that the Takings Clause was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Casitas*, 543 F.3d at 1288 (quotation marks and citation omitted). It is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement. *See Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009). This appeal concerns whether the government's issuance of a NITU constitutes a compensable taking, where no conversion to a recreational trail has occurred.

The appellants' assert that two of our prior cases, *Caldwell*, 391 F.3d 1226 and *Barclay*, 443 F.3d 1368, indicate that the issuance of a NITU amounts to a compensable taking, whether or not the easement is transferred or a recreational trail is ever established. We describe these cases in detail before turning to the parties' arguments.

A.

In *Caldwell*, a railroad company, Norfolk Southern Railway Company (Norfolk), filed a request for exemption under 49 U.S.C. § 10505 (now § 10502) to abandon a rail corridor in Columbus, Georgia. 391 F.3d at 1230-31. Norfolk agreed to negotiate a trail use agreement with the city of Columbus, and on August 31, 1994, the STB issued a NITU. *Id.* at 1231. At the request of Norfolk and the city, the STB extended the NITU to cover an additional

length of railroad line and extended the negotiating period by 180 days. *Id.* On August 17, 1995, Norfolk entered into a trail use agreement with the Trust for Public Land, an entity chosen by the city to negotiate the agreement. *Id.* The STB again extended the NITU negotiating period to ensure that it remained in effect until the actual transfer of the easement to the trail manager. *Id.* at 1232. Norfolk transferred its easement to the trust on October 9, 1996, and the deed was recorded on October 11, 1996. *Id.* On October 7, 2002—less than six years after the transfer of the easement—Mr. William Caldwell filed suit in the Court of Federal Claims on behalf of himself and a class of people owning land burdened by the transferred easement. Mr. Caldwell alleged that the conversion of the rail corridor to a public trail constituted a compensable taking because the conversion extinguished state law reversionary property interests that would otherwise take effect after the railroad abandoned its line. *Id.* The Court of Federal Claims dismissed the suit as untimely, concluding that the statute of limitations began to run on August 17, 1995, when Norfolk entered into a trail use agreement. *Id.* This court affirmed the dismissal, but concluded that the limitations period began to run on *the date that the NITU issued. Id.* at 1233. We determined that the limitations period began when state law reversion interests are "forestalled by operation of § 8(d) of the Trails Act," and we further determined that "this occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)." *Id.* We explained that "[t]he issuance of the NITU is the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Id.* at 1233-34. We

noted that in some cases, no trail use agreement is reached, and we stated that "[i]n these circumstances, a temporary taking may have occurred." *Id.* We affirmed the dismissal of Mr. Caldwell's suit as untimely because although he filed within six years of the actual transfer of the easement, he filed more than six years after the NITU issued.[2]

In *Barclay*, we reaffirmed that "takings law supplies a single bright-line rule for accrual." 443 F.3d at 1378. We addressed two appeals, one from Mr. John Barclay and other landowners (Barclay appellants) and the other from Renewal Body Works, Inc. (Renewal). Renewal filed its complaint in the Court of Federal Claims on December 11, 2003, alleging that the conversion of a railroad right-of-way across its property under the Trails Act constituted a Fifth Amendment taking. *Id.* at 1372. The STB issued a NITU on October 23, 1995, *id.*, and the railroad companies involved "finally reached an agreement with the city on December 22, 1997 through which the city purchased [the railroads'] interests in the rail line segment." *Renewal Body Works, Inc. v. United States*, 64 Fed. Cl. 609, 612 (2005). Noting that *Caldwell* was binding precedent, the Court of Federal Claims dismissed the suit as untimely because the complaint was filed more than six years after the NITU issued, even though the complaint

---

[2] The dissent argued that Mr. Caldwell could not have filed a claim before the easement was actually transferred on October 9, 1996. *Id.* at 1237. According to the dissent, "[n]egotiation of a possible future event may state a hope and a plan, but it is not a fixed, ripe, and compensable taking. The owners of the fee had no right to compensation based on or at the time of these authorizations to negotiate; thus these authorizations could not accrue the period of limitations." *Id.*

was filed less than six years after the trail use agreement. *Id.* at 613.

On appeal, Renewal argued that the issuance of the NITU in October 1995 did not actually block Renewal's reversionary interest. *Barclay*, 443 F.3d at 1373. Renewal pointed out that the railroad removed its ties and tracks from Renewal's land by June 1995, "effectively abandoning it under California law and granting Renewal 'full and exclusive, undisturbed, and uncontested possession and use' of the property until trail use began." *Id.* at 1373. Renewal apparently used the right-of-way for parking after the railroad removed its ties, and it argued that the conversion to trail use ousted it from the right to use the right-of-way for parking. *Id.* at 1374 n.5. Renewal argued that its claim did not accrue until it was physically ousted from the property. *Id.* We rejected this argument. *Id.* at 1374. We explained that "[a]bandonment cannot occur until authorized by federal law, and the NITU precludes abandonment and the reversion that would follow if abandonment were consummated . . . . The barrier to reversion is the NITU, not physical ouster from possession. " *Id.* We stated that "after the issuance of the NITU, the easement continued in existence beyond the time when it otherwise would have been abandoned. Thus, the NITU triggers accrual." *Id.* (quotation marks and citation omitted).

We also affirmed the dismissal of the Barclay appellants' claim. On April 7, 2004, the Barclay appellants filed suit in the United States District Court for the District of Kansas alleging that the railroad rights-of-way across their property were converted into three different recreational trails and that these conversions constituted Fifth Amendment takings. *Id.* at 1371-72. The STB issued NITUs related to the three trails in 1995 and

1996—more than six years before the complaint was filed. *Id.* at 1372 n.2. Following *Caldwell*, which issued while the case was pending, the district court dismissed the case as untimely. *Id.* at 1372. On appeal, the Barclay appellants argued that under Kansas law, the taking occurs "when the railroad ceases operations and the trail operator assumes physical possession." *Id.* The Barclay appellants urged that the trail operator's physical occupation, and not the NITU, blocked the reversion of their state law property rights. *Id.* We stated that even if that were true, "state law reversion was still delayed by the issuance of the NITU, and the claim still accrued with the issuance of the NITU." *Id.* Notably, the NITU issued— and thus the claim accrued—while the railroad was still operating. We stated: "It similarly makes no difference that railroad use may have continued after the NITU issued." *Id.* at 1374.

The Barclay appellants attempted to distinguish their case from *Caldwell*. The Barclay appellants pointed out that they petitioned to the STB to reopen the proceedings for a portion of the right-of-way (the Sunflower Trail), and they asserted that claims related to that trail did not accrue until their petition was finally denied. *Id.* at 1377. We rejected this position: "This is merely another version of the argument—rejected in *Caldwell*—that the original NITU should not be viewed as the taking because subsequent events might render the NITU only temporary." *Id.* at 1378. The Barclay appellants also argued that when the STB issues a modified NITU, a separate taking occurs. We disagreed and determined that a series of NITU orders must be viewed as a single and continuous government action, and thus any extensions or modifications of the original NITU are not separate compensable takings. *Id.* at 1375-76. We concluded that this was true even when the STB issued a new NITU ten days after the

original NITU expired. *Id.* After rejecting all of the appellants' arguments, we affirmed the dismissal, concluding that "we adhere to *Caldwell* and hold that the issuance of the original NITU triggers the accrual of the cause of action." *Id.* at 1378.[3]

## B.

The appellants argue that we created a bright-line rule in *Caldwell*, 391 F.3d at 1235, that a taking occurs when the STB issues a NITU. The appellants assert that we reaffirmed this rule in *Barclay*, in which we stated that "a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU . . . . The issuance of the NITU is the only event that must occur to entitle the plaintiff to institute an action." 443 F.3d at 1373 (quotation marks and citations omitted). The appellants further assert that we once again affirmed this rule, albeit in a non-precedential opinion, stating that "[w]e held in *Caldwell* and reaffirmed in *Barclay v. United States*, 443 F.3d, 1368, 1378 (Fed. Cir. 2006) that the issuance of the original NITU triggers the accrual of the cause of action under the Tucker Act." *Illig v. United*

---

[3] The dissent argued that "[a] Fifth Amendment taking cannot occur simply upon issuance of a NITU, because the deprivation of the reversion has not yet occurred, and may never occur." *Id.* at 1378. The dissent explained that under *Preseault*, 100 F.3d 1525, the conversion of a railroad to a trail can constitute a taking, but the cause of action and the right to compensation do not vest until the claim accrues. *Id.* at 1379. The dissent stated that "[t]he general rule in physical takings cases is that the taking is actionable when the property is taken and liability is fixed, not when it is suggested to be taken." *Id.* The dissent further explained that the majority's "choice of bright line would vest compensation rights although no taking may ever occur." *Id.* at 1380.

*States*, 274 Fed. Appx. 883 (Fed. Cir. 2008), *cert denied*, 77 U.S.L.W. 3707 (U.S. June 29, 2009) (No. 08-852).

The appellants acknowledge that in *Caldwell*, *Barclay*, and *Illig*, we addressed the beginning of the limitations period for a Rails-to-Trails takings claim. The appellants explain that the standard rule is that the limitations period commences when the cause of action is complete. They contend that it is not possible to have a claim accrue without having all elements of the claim present on the same date. Thus, according to the appellants, by holding that the limitations period begins on the date of the NITU, we determined that all of the elements of a takings claim were present on that date. The appellants argue that it is improper to look to events after the accrual date—such as whether a trail was established—to determine whether a claim arose. "If the statute of limitations starts running (as it has in every Trails Act case since *Caldwell*) when the NITU is issued even though no trail is then 'established' and no physical occupation of the land has occurred, then a trail being 'physically established' cannot be an element required to fix the government's liability." Appellants' Br. at 35. The appellants argue that the Court of Federal Claims "seems to believe a NITU triggers claim accrual for the purpose of beginning the statute of limitations clock running, but a landowner's taking claim does not arise until a trail is subsequently established." *Id.* at 34. They contend that if we affirm the decision of the Court of Federal Claims, "landowners whose property is subject to a NITU would be left in the untenable position of having the [six-year statute of] limitations period running – and even expiring – before their claim for compensation accrues." *Id.* at 36. The appellants conclude that the Court of Federal Claims erred by not following the *Caldwell* bright-line rule.

The government responds that a physical occupation is required for a physical takings claim. The government contends that the NITU did nothing more than place a temporary regulatory hold or moratorium on the railroad's authority to abandon its rail corridor, allowing the railroad and a trail operator to negotiate a potential trail use agreement. The government asserts that under *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002), the mere delay in the use of property does not result in a physical takings claim. The government asserts that the appellants did not assert a regulatory takings claim, and that even if they had brought such a claim, it would also fail. The government asserts that a Rails-to-Trails takings claim requires an actual conversion of a railroad to a new use that is outside the scope of the initial conveyance, and the government explains that the NITU does not by itself result in such a conversion.

The government seeks to distinguish *Caldwell* and *Barclay*, asserting that those cases address when a takings claim accrues rather than whether a takings claim can be established. The government points to our statement in *Caldwell* that: "This case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached." *Caldwell*, 391 F.3d at 1234 n.7. The government argues that in *Caldwell*, we "recognized that a categorical treatment of a NITU is not possible," Gov't Br. at 31, quoting from the following passage:

> [T]he NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred. It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.

*Caldwell*, 391 F.3d at 1234 (citations and footnote omitted). The government asserts that this case differs from *Caldwell* and *Barclay* in that no trail was ever established.

The government further asserts that the delay in the reversion of the appellants' state law property interests is not due to the NITU but rather is due to San Pedro's extensions for the time to file a notice of consummation. The government asserts that San Pedro had the option to request these extensions notwithstanding the NITU. Thus, the government argues that the regulatory process is the same as it would have been had no NITU issued. The government asserts that these facts do not give rise to a compensable taking.

## C.

Whether we agree with the *Caldwell* bright-line rule, it is settled law. A taking occurs when state law reversionary property interests are blocked. *Caldwell*, 391 F.3d at 1233-34; *Barclay*, 443 F.3d at 1374 ("The barrier to reversion is the NITU, not physical ouster from posses-

sion."). The NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement.[4] We are bound by our prior decisions that when the NITU is issued the claim has accrued and the statute of limitations period commences. "Having determined that the appellants' takings claim accrued on the date when the NITU was issued, we must now determine if the six year statute of limitations bars Caldwell's claim in this case." *Caldwell*, 391 F.3d at 1235. "The issuance of the NITU is the only event that must occur to 'entitle the plaintiff to institute an action.' Accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way." *Barclay*, 443 F.3d at 1373. "[W]e adhere to *Caldwell* and hold that the issuance of the original NITU triggers the accrual of the cause of action." *Id.* at 1378; *see also id.* at 1374 ("[T]he NITU triggers accrual.").

The government's attempts to distinguish *Caldwell* and *Barclay* are not persuasive. In *Caldwell* and *Barclay*, we indicated that physical occupation is not required. *See, e.g.*, *Barclay*, 443 F.3d at 1374 ("The barrier to reversion is the NITU, not physical ouster from possession."). Indeed, the Barclay appellants' claim accrued while the railroad was still operating. *Id.* "In general, a takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). Because according to our precedent, a takings claim

---

[4] The government disputes the character of the property rights in this case. For purposes of summary judgment, however, we must assume facts in favor of the appellants.

accrues on the date that a NITU issues, events arising after that date—including entering into a trail use agreement and converting the railway to a recreational trail—cannot be necessary elements of the claim. Hence it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established.

This court is bound by *Barclay* and *Caldwell*. We cannot and will not divorce the claim accrual from commencement of the statute of limitations as the government urges. "The standard rule is that the limitations period commences when the plaintiff has a complete and present cause of action." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (quotation marks omitted). "Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Id.* "While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute." *Reiter v. Cooper*, 507 U.S. 258, 267 (1993). Section 2501 sets forth the applicable limitation period: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Nothing in § 2501 indicates that the claim accrual date for purposes of bringing suit differs from the date on which the limitations period commences. There is no basis for concluding that the statute of limitations begins to run on a land owner's physical taking claim when the NITU issues, but that a physical taking claim

has not accrued at that point. We will not divorce claim accrual and the limitations period. Therefore, the issuance of the NITU marks both the beginning of the limitations period and the date on which a claim accrues for purposes of bringing suit.

To hold otherwise could potentially deprive appellants of the ability to file a takings claim at all. As explained by the appellants, landowners whose property is subject to a NITU would be left in the untenable position of having the six-year limitations period running—and even expiring—before they could file suit. Indeed, here, the limitations period began in July 2006, and STB extended the deadline for San Pedro to file a notice of consummation indicating abandonment of the Northern Stretch to July 2011. If San Pedro elects to request another one-year extension and does not commence abandonment by July 2012, the limitations period will have expired. If we adopted the government's proposed rule, the limitations period for the taking of the land owner's property rights would expire before the land owner ever had the right to bring suit for this same taking (prior to claim accrual).

In fact, in its brief opposing the petitioner's request for *certiorari* in *Illig*, 274 Fed. Appx. 883, the government acknowledged that *Caldwell* established the right to seek compensation upon the issuance of a NITU. The government explained:

> It is true that, under *Caldwell*, landowners may seek compensation for an alleged taking immediately upon issuance of the NITU, even though no trail use agreement is reached, and any taking that may later be found would only have been temporary.

J.A. 1736. The government opposed the grant of *certiorari* and extolled the bright-line rule as having "the singular virtue of providing certainty to prospective claimants of when their claims accrue and when the limitations period expires." J.A. 1735.

In light of *Caldwell* and *Barclay*, we reject the government's present suggestion that the NITU is nothing more than a temporary regulatory hold on the railroad's authority to abandon its railway. In *Caldwell*, we rejected the notion that two takings might occur in a Rails-to-Trails case—a regulatory taking followed by a physical taking. We stated that "a taking occurs when the owner is deprived of use of the property . . . by blocking the easement reversion. While the taking may be abandoned . . . by the termination of the NITU[,] the accrual date of a single taking remains fixed." *Caldwell*, 391 F.3d at 1235. We further explained: "The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." *Id.* Thus, the NITU forestalls or forecloses the landowners' right to unencumbered possession of the property. *Cf. Nollan v. Cal. Costal Comm'n*, 483 U.S. 825, 831 (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather ... 'a mere restriction on its use,' is to use words in a manner that deprives them of all their ordinary meaning.") (internal citations omitted).

As indicated in *Caldwell* and *Barclay*, where no trail use agreement is reached, the taking may be temporary. *See Caldwell*, 391 F.3d at 1234; *Barclay*, 443 F.3d at 1378. However, physical takings are compensable, even when temporary. *See Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991) ("A taking can be for a limited

term-what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute."); *see also Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641-42 (1987). The duration of the taking goes to damages, not to whether a compensable taking has occurred.

CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is reversed. We remand for a determination of the compensation owed to the appellants for the taking of the Southern Stretch and the Northern Stretch of railway line.

**REVERSED AND REMANDED**