NOTE: This opinion is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**NORMA E. CAQUELIN, KENNETH CAQUELIN, FOR THEMSELVES AND AS REPRESENTATIVES OF A CLASS OF SIMILARLY SITUATED PERSONS,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2016-1663

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00037-CFL, Judge Charles F. Lettow.

---

Decided: June 21, 2017

---

ELIZABETH MCCULLEY, Stewart Wald & McCulley, LLC, Kansas City, MO, argued for plaintiffs-appellees. Also represented by THOMAS SCOTT STEWART.

ERIKA KRANZ, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented

by JOHN C. CRUDEN, KATHERINE J. BARTON, MATTHEW LITTLETON.

ROBERT THOMAS, Damon Key Leong Kupchak Hastert, Honolulu, HI, for amici curiae Southeastern Legal Foundation, Property Rights Foundation of America, Inc.

MARK F. HEARNE, II, Arent Fox, LLP, Clayton, MO, for amici curiae National Association of Reversionary Property Owners, National Cattlemen's Beef Association, Public Lands Council. Also represented by MEGHAN SUE LARGENT, LINDSAY S.C. BRINTON, STEPHEN SHARP DAVIS.

ANDREA CAROL FERSTER, Rails-to-Trails Conservancy, Washington, DC, for amicus curiae Rails-to-Trails Conservancy.

———————————

Before PROST, *Chief Judge,* TARANTO and HUGHES, *Circuit Judges.*

PER CURIAM.

This rails-to-trails case involves property owned by the Caquelins that, in 2013, was subject to a railroad-held easement limited to railroad use. The railroad or its predecessors had held the easement since 1870. It is undisputed that the easement would terminate when the railroad ceased using the easement for its stated purpose and abandoned the line.

In May 2013, the railroad filed a Notice of Exemption with the Surface Transportation Board, seeking the Board's permission to abandon the line and invoking a regulatory exemption from the usual rail-use-related standards that the Board applies in determining whether to grant such permission. J.A. 24–76; 49 C.F.R. § 1152.50. To support its invocation of the exemption, the

railroad certified that it had not run trains over the line for several years. J.A. 27. The railroad stated that the abandonment would "be consummated on or after the effective date of a Board decision" on the abandonment exemption. J.A. 26.

On July 3, 2013, two days before the abandonment exemption was scheduled to take effect, the Board issued a Notice of Interim Trail Use or Abandonment (NITU) under 16 U.S.C. § 1247(d) and 49 C.F.R. § 1152.29, which prohibited the railroad from abandoning the rail line for a period of 180 days.[1] The barring of abandonment blocked reversion of the easement interest to the Caquelins, *i.e.*, the lifting of the burden of the easement from their ownership. As relevant here, the Board's stated reason for its action was to allow the railroad to negotiate with two entities—not including the Caquelins—that had jointly proposed to create and manage a recreational trail on the land. The Board's action was not based on any foreseeable continuation or resumption of railway use—the NITU authorized the railroad to salvage track and related materials even during the 180-day period, J.A. 83, and granted the railroad authority to abandon the line if the 180-day period ended with no extension or trail agreement, J.A. 82, 84.

If the railroad and potential trail sponsors had reached a proper trail agreement while the NITU was in effect, the Caquelins would have been blocked from regaining an unburdened interest in their land during the life of the trail use. *See* 49 U.S.C. § 1247(d); *Toews v. United States*, 376 F.3d 1371, 1381 (Fed. Cir. 2004). In its

---

[1] In other cases, we are informed, the Board has repeatedly extended the 180-day period, barring termination of easements for years. *See, e.g.*, *Wis. Cent. Ltd.* No. AB-303 (Sub-No. 18X), 2010 WL 738577 (Surface Transp. Bd. Mar. 4, 2010).

briefing to this court, the government does not deny that such a trail agreement would properly be deemed a categorical taking—without a multi-factor analysis looking beyond the fact that the government-authorized trail use exceeded the scope of the easement. *See* Government's Br. 20–51.[2]   On that premise, the NITU would block reversion of the railroad easement to the landowners in order to secure time to arrange what would be a categorical taking where, as here, the easement was limited to railway use. *See Toews*, 376 F.3d at 1375–82.

In this case, the 180-day period was never extended, and no trail agreement was reached.  The railroad completed its abandonment of the line a few months after the NITU lapsed.  And the easement burdening the Caquelins' ownership of the land was lifted.

The Caquelins sued the United States under the Tucker Act, alleging that the temporary blocking of rever-

---

[2]   The Supreme Court has used "categorical taking" to refer to several types of government actions—such as certain land-interest appropriations or transfers, "physical" appropriations of personal property or occupations of real property by the government or its designee, or impositions of public-access requirements—that have been deemed takings based on "per se" or relatively "bright-line" rules.  Contrasted are other government actions—such as certain police-power regulations restricting owners' particular uses of their land—for which a takings determination requires a more complex multi-factor analysis. *See, e.g.*, *Horne v. Dep't of Agriculture*, 135 S. Ct. 2419, 2425–28 (2015); *Koontz v. St. John's River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2598–600 (2013); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321–24 (2002); *Dolan v. City of Tigard*, 512 U.S. 374, 383–86 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–35 (1987).

sion of the easement interest constituted a compensable temporary taking. The Court of Federal Claims held, on summary judgment, that a categorical taking had occurred, relying on this court's decision in *Ladd v. United States*, 630 F.3d 1015, 1019, 1023 (Fed Cir. 2010), *reh'g and reh'g en banc denied*, 646 F.3d 910 (Fed. Cir. 2011). *See Caquelin v. United States*, 121 Fed. Cl. 658 (2015). The parties agreed on the amount of compensation.

The United States appeals. It does not argue that, as a matter of law, no taking occurs unless a trail agreement is reached. Nor does the government dispute that if a temporary taking occurred, it began on July 3, 2013, the date of the NITU. Rather, the government argues that the 180-day blocking of reversion was not a categorical taking but instead calls for a multi-factor takings analysis. It invokes the general "regulatory takings" framework set forth to govern land-use restrictions in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), and the temporary-takings analysis set forth to govern the repeated controlled floodings, for water-management purposes, at issue in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 38–40 (2012)—without indicating whether those standards differ materially.[3] Recognizing the difficulty of adopting such

---

[3] In *Arkansas Game*, the United States argued to the Supreme Court that, if the repeated, temporary flooding at issue could constitute a taking at all, the determination must be made under a multi-factor analysis, for which it cited *Penn Central*. Br. for Respondent, *Ark. Game*, 133 S. Ct. 511, 2012 WL 3680423, at *38, *42, *44 (No. 11-597). The government argued that cases in which "the government itself (or its designee) physically occupied private property" were "inapt," reasoning that "it is not sensible to regard the water [entering the downstream lands during the flooding] as being an occupation

an approach while *Ladd* remains controlling precedent, the government's principal argument is that *Ladd* should be overruled en banc.[4]

We think it clear that application of this court's decision in *Ladd* would lead to affirmance of the Court of Federal Claims' judgment in this case. We also think that this panel cannot declare *Ladd* no longer to be good law based on the Supreme Court's post-*Ladd* decision in

---

by the government" and "any flooding of a downstream riparian parcel is typically the consequence of government action outside, and not specific to, that parcel, much like general government regulation of the use of private property." *Id.* at \*40–41. The Supreme Court ruled that a multi-factor approach was required "[w]hen regulation or temporary physical invasion by government interferes with private property," 568 U.S. at 38, and it remanded for application of the approach, *id.* at 37–40. On remand, this court applied the multi-factor approach and affirmed the Court of Federal Claims' finding of a taking. *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364 (Fed. Cir. 2013).

[4]    *Ladd* relied on *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), which held that a takings claim accrues, and the six-year statute of limitations begins to run, when an NITU issues, so that a takings claim filed more than six years after the NITU is out of time. *Id.* at 1233. After *Caldwell* adopted that rule, the government defended it and relied on it to secure dismissals of a number of takings suits as untimely. *See, e.g.*, *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006). The present case does not involve an accrual or timeliness question. But the government argues that, if the *Ladd* ruling as to the merits of the takings challenge is deemed to follow from *Caldwell*'s accrual ruling, as *Ladd* held, then this court should overrule *Caldwell* as well as *Ladd*.

*Arkansas Game*, on which the government heavily relies. Nevertheless, in requiring a multi-factor analysis of the repeated floodings at issue as "temporary physical invasion[s]," 568 U.S. at 38, *Arkansas Game* does raise questions about *Ladd*. Those questions supplement the questions raised (including by the author of *Ladd*) when *Ladd* was decided. *See Ladd v. United States*, 646 F.3d 910 (Fed. Cir. 2011) (Gajarsa, J., joined by Moore, J., dissenting from denial of rehearing en banc). En banc review may be warranted to address those questions, in light of the full range of Supreme Court decisions, and to decide whether *Ladd* should remain governing precedent. In so stating, we neither state a conclusion that en banc review is warranted nor prejudge the merits of the takings issues.

Before deciding whether en banc review is worthwhile, we think, it is advisable to have the litigation record in this case further developed. Perhaps en banc review might not be warranted, for example, if an appropriate multi-factor analysis were to lead to the same conclusion as the one *Ladd* drew—that an NITU like the one here constitutes a taking for reasons common to many rails-to-trails cases (leaving only the question of proper compensation, which is not at issue here). In any event, this court's further consideration of what the proper takings framework is, whether *Ladd* or something else, would benefit from a fully developed record applying the multi-factor analysis the government urges as a substitute for *Ladd*. Such a record would give the court a concrete basis for comparison of the competing legal standards as applied.

Accordingly, we vacate the judgment and remand for development of such a record. On remand, the Court of Federal Claims should conduct such proceedings—pretrial, trial, and post-trial—as are necessary for an adjudication of how the government-advanced multi-factor analysis applies in this case, on the assumption that such

an analysis is the governing standard.  An opinion containing findings of fact and conclusions of law under such a standard—and also discussing what facts invoke which of the Supreme Court's standards—would sharpen the focus of appellate consideration of the issues raised by the government in this case.  We recognize that, under *Ladd* as the current governing law in this court, it does not appear that this remand could result in a different Court of Federal Claims judgment.  We vacate and remand because a more fully developed record will materially aid this court in deciding how ultimately to resolve the merits of the takings issues presented.

No costs.

**VACATED AND REMANDED**