# United States Court of Appeals for the Federal Circuit

---

**DAVID H. BEHRENS, ARLINE M. BEHRENS, ET AL.**
*Plaintiffs*

**MARK W. HEINTZ, HELEN M. HEINTZ, ET AL.**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-1277

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00421-PEC, Judge Patricia E. Campbell-Smith.

---

Decided: February 13, 2023

---

THOMAS SCOTT STEWART, Stewart Wald & McCulley, LLC, Kansas City, MO, argued for plaintiffs-appellants. Also represented by ELIZABETH MCCULLEY, REED RIPLEY.

JOHN LUTHER SMELTZER, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TODD KIM, ERIKA KRANZ,

WILLIAM B. LAZARUS.

MARK F. HEARNE, II, True North Law Group, LLC, St. Louis, MO, for amicus curiae James W. Ely, Jr. Also represented by STEPHEN S. DAVIS.

MEGHAN S. LARGENT, Lewis Rice LLC, St. Louis MO, for amicus curiae Missouri Farm Bureau Federation. Also represented by MICHAEL ARMSTRONG, LINDSAY BRINTON.

————————————

Before DYK, TARANTO, and HUGHES, *Circuit Judges.*

DYK, *Circuit Judge.*

Appellants are property owners seeking compensation for an alleged taking pursuant to the National Trails System Act ("Trails Act"), Pub. L. No. 90-543, 82 Stat. 919 (1968) (codified as amended at 16 U.S.C. §§ 1241–51). The issuance of a Notice of Interim Trail Use ("NITU") allowing interim trail use and railbanking constitutes a Fifth Amendment taking if the railroad had been granted an easement, interim trail use and railbanking were beyond the scope of the easement, and the NITU caused a delay in termination of the easement. The Court of Federal Claims ("Claims Court") found that the property interests at issue were easements, but that interim trail use was within the scope of the easements. We hold that the Claims Court erred in interpreting Missouri law and in concluding that interim trail use was within the scope of the easements. We also hold that railbanking is not within the scope of the easements. There being no causation dispute, the NITU issuance constituted a taking. We reverse and remand.

BACKGROUND

I

When a railroad wishes to relinquish responsibility over a railroad corridor, it must seek permission to

abandon the corridor.    49 U.S.C. § 10903; *see also id.*
§ 10502 (authorizing exemptions).   Under the Trails Act,
before abandonment is consummated, other entities can in-
tervene to railbank the corridor, that is, preserve it for fu-
ture railroad use.   16 U.S.C. § 1247(d); *see also* 49 C.F.R.
§ 1152.29(a).   The railbanking intervention process, as au-
thorized by § 1247(d), allows a railroad to negotiate with
the intervening entity, which would then assume financial
and managerial responsibility for the corridor by operating
it as a recreational trail.   *See Preseault v. Interstate Com.
Comm'n*, 494 U.S. 1, 6–7 (1990) ("*Preseault I*").

Before the potential trail operator can begin negotia-
tions with the railroad, it must file a railbanking petition.
*See* 49 C.F.R. § 1152.29(a).   The potential trail operator
must state its "willingness to assume full responsibility for[
m]anaging the right-of-way; [a]ny legal liability arising out
of the transfer or use of the right-of-way . . . ; and [t]he pay-
ment of any and all taxes . . . [on] the right-of-way."   *Id.*
§ 1152.29(a)(2) (subsection numbers omitted).   The opera-
tor must also acknowledge that the land will remain "sub-
ject to possible future reconstruction and reactivation of
the right-of-way for rail service."   *Id.* § 1152.29(a)(3).

> If the railbanking petition meets [certain] criteria,
> and the railroad agrees to negotiate with the peti-
> tioner and . . . communicates [that agreement] to
> the [Surface Transportation Board ("STB")] within
> ten days of the filing of the trail use petition, the
> STB will issue a [NITU].   This NITU permits the
> railroad to discontinue service, cancel tariffs, and
> salvage track and other equipment, "consistent
> with interim trail use and rail banking" without
> consummating an abandonment and the NITU ex-
> tends indefinitely to permit interim trail use once
> an "agreement" is reached between the railroad
> and the trail operator.

*Caldwell v. United States*, 391 F.3d 1226, 1230 (Fed. Cir. 2004) (quoting 49 C.F.R. § 1152.29(d)(1)) (citing 49 C.F.R. § 1152.29(b)(2), (d)).  The Trails Act authorizes the suspension of abandonment, providing "if such interim [trail] use is subject to restoration or reconstruction for railroad purposes, such use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  § 1247(d).

It is now well-settled that the issuance of a NITU under the Trails Act may result in a taking of property owned by the original grantor of the easement.  The Supreme Court noted in *Preseault I* that:

> [The] language [of § 1247(d)] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests.  While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations.  State law generally governs the disposition of reversionary interests . . . .  By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law[.]

*Preseault I,* 494 U.S. at 8 (citations omitted).  In general, "[a] Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail." *Caldwell*, 391 F.3d at 1229 (citations omitted).  As we discussed in *Preseault v. United States*, if the "establishment [of a public recreational trail] [can]not be justified under the terms and within the scope of the existing easements[,] . . . [t]he taking of possession of . . . lands . . . for use as a public

trail [is] in effect a taking of a new easement for that new use, for which . . . landowners are entitled to compensation." 100 F.3d 1525, 1550 (Fed. Cir. 1996) ("*Preseault II*") (en banc) (plurality opinion). A taking effectuated by the NITU occurs at the time that, had there been no NITU, the easement would have terminated under state law. *See Caquelin v. United States*, 959 F.3d 1360, 1363, 1370–73 (Fed. Cir. 2020).

Over the past thirty years, following our decision in *Preseault II*, we have considered a variety of cases alleging Fifth Amendment takings in this rails-to-trails context. *See, e.g.*, *Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020); *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010); *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005); *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004). These cases depend on state law and the facts of the particular land grants.

## II

This appeal concerns a 144.3-mile corridor ("Corridor") utilized by the St. Louis, Kansas City, and Chicago Railroad Company ("Railroad Company") beginning in the early 1900s for the operation of a railroad. The necessary easements were acquired through a mix of condemnations and land grants from property owners. At issue in this appeal are nineteen source deeds conveying easements as to properties located along the Corridor. These easements were granted to the Railroad Company between January 1901 and April 1902, each for the consideration of one dollar. Plaintiff-appellants are the owners of these underlying properties and are collectively referred to as Behrens. Eighteen of the deeds did not state a limitation of the grant to use for railroad purposes. One deed (the "Second Backues Deed"), which may or may not be the subject of a takings claim, *see* note 10, *infra*, specified that the land is "conveyed to said Railroad company for the purpose of side

tracks, station houses, ware houses, stock yards, and for such uses as are necessary in the operation of said Railroad." J.A. 2335.

These easements were passed on to different railroads throughout the years. Most recently, the easements were conveyed to the Missouri Central Railroad Company which then leased the operating rights to Central Midland Railway Company. Missouri Central Railroad and Central Midland Railway wished to discontinue service on and abandon the railway and filed a verified notice of exemption that, if granted, would allow the railroads to consummate abandonment.

On December 16, 2014, the Missouri Department of Natural Resources filed a timely request to intervene in the abandonment proceeding, seeking to utilize the easements for interim trail use on the Corridor. On February 26, 2015, the STB issued a NITU for the corridor. On December 20, 2019, the Missouri Central Railroad and the Natural Resources Department jointly notified the STB that they had executed a trail use agreement in accordance with the NITU and STB regulations.

## III

Plaintiffs filed takings claims on April 27, 2015, in the Claims Court.[1] Plaintiffs moved for summary judgment on liability, asserting that the railroad originally acquired mere easements, pursuant to Missouri law; that the railroad's easements were limited to railroad purposes; and that the conversion of the easements for a public recreational trail was beyond the scope of easements, and thus constituted a taking. The government then cross-moved for summary judgment on the ground that the deeds

---

[1]    This case also involved other properties that are not at issue in this appeal.

granted an easement broad enough to allow for interim trail use and railbanking.

The Claims Court held that the property rights acquired by the railroad here on appeal were easements but that the government was not liable for a taking as to those parcels because the easements allowed interim trail use. Addressing a Missouri statute that is central to this case, the Claims Court "decline[d] to apply the presumption" "that any conveyance of an easement to a railroad made by voluntary grant . . . is statutorily limited in scope to railroad purposes only." J.A. 5–6 (citation omitted).

Plaintiffs filed a motion for reconsideration. The Claims Court set aside the grant of summary judgment in favor of the government because "imprecise language [in the original opinion] implie[d] that the easements [were] 'unlimited'" and noted that "it must . . . more carefully define the scope of the . . . easements" in further proceedings. J.A. 22. After further proceedings regarding the scope of the easements, the Claims Court again held that the government was not liable for a taking because the easements, while not unlimited, were nonetheless broad enough to allow interim trail use. The Claims Court so held because "it would violate the primacy of the grantor's intent to find that the deeds—which otherwise appear to convey a fee interest—should be artificially limited to plaintiffs' definition of railroad purposes simply because Missouri law construes conveyances for nominal consideration to be easements." J.A. 40. The Claims Court also concluded that "the broad granting language and habendum clauses in the deeds at issue are convincing evidence that the grantors intended unrestricted conveyances." J.A. 39.

In the course of proceedings in the Claims Court, plaintiffs also filed various motions for summary judgment on the alternative ground that the government was liable for a taking because the Missouri Central Railroad abandoned

the easement prior to the NITU. The Claims Court found various procedural shortcomings with these motions and never decided the issue of abandonment, ultimately holding that an abandonment claim was forfeited because plaintiffs failed to timely raise the issue in a summary judgment motion.

After the deadline for filing summary judgment motions had passed, the parties jointly moved for an entry of judgment under Rule 54(b) of the Rules of the Court of Federal Claims on the easements here on appeal.[2] The Claims Court granted the motion. Plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review the grant of summary judgment de novo. *Ladd*, 630 F.3d at 1019.

## DISCUSSION

As described above, "[i]t is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd*, 630 F.3d at 1019 (citing *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009)). The language of the deed and state law govern the scope of the easement. *See Preseault II*, 100 F.3d at 1533.

Under *Preseault II*, the first step in determining if there was a taking is to determine if a railroad had obtained easements or fee simple estates. *See id.* In this case, it is undisputed that the Missouri Central Railroad had easements and not fee simple interests. *See* Gov't's

---

[2]    The Rule 54(b) motion was necessary because other parcels of land remained in the case before the Claims Court.

Br. 33.  A Missouri statute that has been in effect since 1855 gives railroads the power:

> [t]o take and hold such voluntary grants of real estate and other property as shall be made to it to aid in the construction, maintenance and accommodation of its railroads; but the real estate received by voluntary grant shall be held and used for the purpose of such grant only . . . .

Mo. Rev. Stat. § 1035 (1899), now § 388.210(2).  Under Missouri law, a conveyance of property to a railroad for nominal consideration is treated as a voluntary grant, and one dollar is nominal consideration.  *Brown v. Weare*, 152 S.W.2d 649, 653–54 (Mo. 1941).  Each grant in this case was to a railroad and for one dollar.  These conveyances were thus voluntary grants.  Voluntary grants to railroads are easements even if they are formally worded as grants of fee simple estates.  *Id.* at 654*; see also Boyles v. Mo. Friends of Wabash Trace Nature Trail, Inc.*, 981 S.W.2d 644, 648 (Mo. Ct. App. 1998) ("Where the acquisition is for right-of-way only, however, whether by condemnation, voluntary grant, or conveyance in fee upon valuable consideration, the railroad takes only an easement over the land and not the fee." (citations omitted)).  Therefore, as the Claims Court held, each grant was an easement, and the government does not argue otherwise.

The second step is determining the scope of the easements.  *See Preseault II*, 100 F.3d at 1533.  The government seeks to defend the Claims Court decision arguing that the statute does not define the scope of the easements and that under Missouri common law, the court must give effect to the intention of the grantor.  "It is well settled in [Missouri] that the rule to be observed in the construction of deeds is to ascertain the intention of the grantor, and to give effect to such intention, unless it conflicts with some positive rule of law." *St. Louis Union Tr. Co. v. Clarke*, 178 S.W.2d 359,

363 (Mo. 1944) (en banc). Under Missouri law, an easement is "a right to use the land for particular purposes." *Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795, 799 (8th Cir. 2017) (citation omitted) (quoting *St. Charles Cnty. v. Laclede Gas Co.*, 356 S.W.3d 137, 139 (Mo. 2011) (en banc)). In the case of eighteen of the nineteen deeds at issue, the deeds themselves contain no language stating a limitation of the grant to specified purposes. It follows, argues the government, that the Claims Court correctly found that the easements granted to the railroad were broad in scope and covered trail use. The plaintiffs here disagree as to the appropriate construction of the deeds under common law. We need not resolve this dispute because we conclude that the Missouri statutory provision, § 388.210(2) explicitly limits the scope of the easements to railroad purposes.

The Missouri statute states that a voluntary grant "shall be held and used for the purpose of such grant only." Mo. Rev. St. § 388.210(2). The statute defines the purpose of such voluntary grants as "to aid in the construction, maintenance and accommodation of its railroads." *Id.* The Missouri Supreme Court has construed this language to mean that such grants are for "all railroad purposes." *Brown*, 152 S.W.2d at 653 (stating that this statutory provision "includes all railroad purposes"); *see also id.* at 654 ("The statute makes no distinction according to the exact railroad purpose for which the land is to be used but in effect requires only that the land be used for railroad purposes."). "[The] easement ceases to exist when the land is no longer used for railroad purposes." *G.M. Morris Boat Co. v. Bishop*, 631 S.W.2d 84, 87 (Mo. Ct. App. 1982) (citing *Coates & Hopkins Realty Co. v. Kan. City Terminal Ry. Co.*, 43 S.W.2d 817, 821–22 (Mo. 1931) (en banc)). Therefore, by statute, railroad purposes are the only allowable purposes of the granted easements and define the scope of the easements.

BEHRENS v. US 11

We must then determine whether trail use and rail-banking are within the scope of the easements, *i.e.*, whether (1) trail use and (2) railbanking are railroad purposes. In Missouri, trail use, the first of these uses, is not a railroad purpose. *Boyles* is a leading Missouri case on the scope of railroad easements. 981 S.W.2d 644. A Missouri constitutional provision states that properties taken by the railroad by condemnation are taken "for railroad purposes." *Id.* at 648 (quoting Mo. Const. art. I, § 26). In *Boyles*, a railroad acquired an easement through condemnation. *Id.* at 646. The railroad thereafter conveyed the contested railroad corridor easement via a quit claim deed to an organization that undertook to turn the corridor into a trail. *Id.* at 647. The original owners filed a petition to quiet title on the basis that the easement had ceased to exist because it did not extend to trail use. *Id.* at 647–48. In interpreting the constitutional provision, the court concluded that trail use "do[es] not fall within the commonly understood meaning of 'railroad purposes.'" *Id.* at 649.[3]

We have similarly and consistently held that trail use is not a railroad purpose under other states' laws. *See, e.g.*, *Presault II*, 100 F.3d at 1541–44 (applying Vermont law); *Toews*, 376 F.3d at 1376 (applying California law and stating that "it appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac

---

[3]    *See also Eureka Real Est. & Inv. v. S. Real Est. & Fin. Co.*, 200 S.W.2d 328, 332 (Mo. 1947) (finding that an easement granted to a railroad did not allow the construction of a power line that had no connection to the railway); *St. Louis, I.M. & S. Ry. Co. v. Cape Girardeau Bell Tel. Co.*, 114 S.W. 586, 587–88 (Mo. Ct. App. 1908) (finding that establishing a telephone line for public use was beyond the scope of an easement granted to a railroad because the public telephone line was not a railroad purpose).

pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains").

The government argues, however, that the Trails Act has an alternative purpose—railbanking, the preservation of the right-of-way for possible future railroad use—and that the easements under the statute are broad enough to cover railbanking.  The Trails Act provides that trails created under the Act must be "subject to restoration or reconstruction for railroad purposes."  16 U.S.C. § 1247(d).

Under Missouri law, establishing a nature trail for the purpose of keeping the corridor intact for future rail service is not considered a railroad purpose if there is no evidence that such future use is realistic.  In *Boyles*, the court rejected the argument that "because one of the purposes of the trail is to keep the existing corridor intact for transportation needs that may occur in the future, such as reactivated rail service, [the easement's] proposed use [as a trail] is for railroad purposes."[4]  *Boyles,* 981 S.W.2d at 649.  The *Boyles* court found that this argument "ha[d] no merit" because "[t]he undisputed evidence, including the removal of the bridges, ties, and rail by [the railroad company], showed that no such [future railroad] use is realistic."  *Id.* at 649–50.  The court also noted that "[t]he proposed development of a hiking, biking, cross-country skiing, and nature trail is completely unrelated to the operation of a railway and consistent only with an intent to wholly and permanently cease railway operations."  *Id.* at 650 (citation omitted).

Thus, in Missouri, trail use with the purported but speculative purpose of preserving the right-of-way for

---

[4]    *Boyles* did not concern a taking under the Trails Act.  *See Boyles*, 981 S.W.2d at 646–48.

future railroad use does not fall within the scope of an easement granted for railroad purposes.  Here, there is no evidence that future rail use is realistic.  The railroad ceased running trains over the Corridor decades ago, and rails and ties have been removed.  There is no evidence of a plan for future railroad use.  The mere preservation of a tract of land for possible future rail use under *Boyles* is not a railroad purpose.[5]

The government argues that *Boyles* should not control here because it concerned rights acquired by condemnation, not voluntary grant.  The government argues that "there is no basis for construing the [voluntary grant] statute narrowly as limiting voluntary grants to railroads to railroad purposes alone."  Gov't's Br. 36.  The government notes that the language in the two provisions, the constitutional provision at issue in *Boyles* and the statute at issue here, is different[6] and urges that the easements acquired

---

[5] The government argues that "nonuse [of the corridor by the railroad] alone will not cause an extinguishment of the easement," Gov't's Br. 46, and that nonuse by the railroad is not sufficient to show that "interim trail use is beyond the scope of a railroad easement that has been properly preserved."  Gov't's Br. 47.  However, the facts of this case show much more than nonuse.  The Missouri Central Railroad started abandonment proceedings and thus specifically disclaimed all interests in the corridor.

[6] The constitutional provision governing land taken by railroads via condemnation reads:  "The fee of land taken <u>for railroad purposes</u> without consent of the owner thereof shall remain in such owner subject to the use for which it is taken."  Mo. Const. art. I, § 26 (emphasis added).  As explained in *Boyles*, this provision states that "railroad purposes" are the "use for which [the land] is taken."  *Boyles*, 981 S.W.2d at 648–49.

by voluntary grant should have a broader scope than those acquired by condemnation.  Specifically, the government contends that "accommodation," which appears in the voluntary grant statute but not the condemnation provision, should be construed to mean something like "benefit," which would go beyond use for strictly railroad purposes and cover easements that benefit the railroad more broadly.[7]  The government argues that the railroad is benefited by preservation for future railroad use.

We do not agree.  The Missouri Supreme Court has suggested that "accommodation" means "operation."  S*ee Brown*, 152 S.W.2d at 653.[8]  This appears to confirm that

---

The voluntary grant statute gives railroads the power "[t]o take and hold such voluntary grants of real estate and other property as shall be made to it <u>to aid in the construction, maintenance and accommodation of its railroads</u>; but the real estate received by voluntary grant shall be held and used for the purpose of such grant only." Mo. Rev. Stat. § 388.210(2) (1949) (emphasis added).

[7]    The government notes that, "[a]round the time of grants in this case, 'accommodation' was defined in legal dictionaries as a 'convenience, favor, or benefit' or 'an arrangement or engagement made as a favor to another, not upon a consideration received.'" Gov't's Br. 34–35 (quoting *Overland Auto Co. v. Winters*, 210 S.W. 1, 4 (Mo. 1919) (referencing contemporaneous definitions from Anderson's Law Dictionary and Black's Law Dictionary)).

[8]    In *Brown*, the court stated that "[b]y statute a railroad has the power 'to take and hold such voluntary grants of real estate and other property as shall be made to it to aid in the construction, maintenance and accommodation [operation?] of its railroads; but the real estate received by voluntary grant shall be held and used for the purpose of such grant only.'" *Brown*, 152 S.W.2d at 653 (alteration in

BEHRENS v. US                                                          15

the benefit must be to current or planned railroad opera-tions rather than to some speculative future use. The Mis-souri voluntary grant statute was not designed to grant easements to railroads going beyond current or planned railroad operations and the use of the term "accommoda-tion" does not suggest otherwise. An overly broad reading of the voluntary grant statute would indeed be contrary to the legislative purpose behind the statute. As the Missouri Supreme Court stated in *Brown*, "the legislature intended positively to interfere in the dealings of a railroad company with the landowners and to protect the latter if the railroad was never constructed, and also if the railroad company abandoned land acquired for its use." *Id.* at 654. In any event, the accommodation provision is designed to benefit the railroad that owned the easement, not the benefit some future unidentified entity that might receive the easement in the future.

We note that we have held that under Vermont law the preservation of a tract of land for future rail use under the Trails Act does not transform interim trail use into a rail-road purpose. *See Preseault II*, 100 F.3d at 1550. In *Pre-seault II*, a plurality concluded that if the creation of a public recreational trail "could not be justified under the terms and within the scope of the existing easements . . . the taking of possession of the lands . . . for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensa-tion." *Id.*; *see also Preseault II*, 100 F.3d at 1554 (Rader, J., concurring) ("The vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement.").

_____

original) (quoting Mo. Rev. Stat. § 5128 (1939) (currently located at Mo. Ann. Stat. § 388.210 (West 2022))).

CONCLUSION

In sum, the easements granted to the railroad were not broad enough to encompass interim trail use or railbanking, and thus Fifth Amendment takings have occurred. We reverse the Claims Court and remand this case for further proceedings consistent with this opinion.[9] We do not reach the abandonment question, though we note that Behren's failure to timely move for summary judgment cannot properly be viewed as a forfeiture of the abandonment theory which should have remained an issue in this case.

---

[9]    Some of the deeds include additional grants beyond the primary grant to the railroad, which is a grant of a "center 100-foot portion of rail corridor." J.A. 14. For example, one deed granted, with no express limitations to the scope, a right-of-way for "[a] strip of land one hundred (100) feet wide, having a uniform width of fifty (50) feet on each side of the center line of the railroad" (the primary grant). J.A. 2320. It also granted, "for the purpose of cuttings and embankments necessary for the proper construction and security of said railroad across the tracts of land described aforesaid," an easement "[o]ne hundred (100) feet on each side of and adjacent to the aforesaid described right of way" (a non-primary grant), as well as "the right of entry across adjacent land of the undersigned for the purposes of construction of said railroad" (a non-primary grant). *Id.* Both parties appear to agree that primary grants are the only source of the takings claims, presumably because the other easements were not used for trails.

There is one possible exception. This exception is the second Backues deed, which does not include a primary grant. We leave the issue of whether a taking occurred with regard to the second Backues deed to the Claims Court to determine on remand.

Given our holding as to the scope of the easement, the abandonment claim is, however, moot.

## REVERSED AND REMANDED

COSTS

Costs to Appellants.