# United States Court of Appeals
# for the Federal Circuit

---

**NORMA E. CAQUELIN,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2019-1385

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00037-CFL, Senior Judge Charles F. Lettow.

---

Decided: May 29, 2020

---

THOMAS SCOTT STEWART, Stewart Wald & McCulley, LLC, Kansas City, MO, argued for plaintiff-appellee. Also represented by ELIZABETH MCCULLEY; STEVEN WALD, St. Louis, MO.

ERIKA KRANZ, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by JEFFREY B. CLARK, ERIC GRANT.

ANDREA CAROL FERSTER, Rails-To-Trails Conservancy, Washington, DC, for amicus curiae Rails-To-Trails Conservancy.

MEGHAN SUE LARGENT, LewisRice LLC, St. Louis, MO, for amici curiae Iowa Farm Bureau Federation, Illinois Agricultural Association, Kansas Farm Bureau, Missouri Farm Bureau Federation. Also represented by LINDSAY BRINTON.

MARK F. HEARNE, II, True North Law Group, LLC, St. Louis, MO, for amici curiae National Association for Reversionary Property Owners, Cato Institute, Southeastern Legal Foundation, Reason Foundation, Inversecondemnation.com, James W. Ely, Jr. Also represented by STEPHEN S. DAVIS.

_____

Before PROST, *Chief Judge*, LINN and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Norma Caquelin owns land that was subject to a railroad-held easement limited to railroad use. The railroad applied to the federal Surface Transportation Board for permission to abandon its rail line, noting that it had run no traffic over the line for two years. Shortly thereafter, the Board granted the permission to abandon, to take effect a month later, unless, as relevant here, the federal-law process for considering use of the easement land for a public recreational trail was duly invoked. That process was invoked, and two days before the abandonment permission was otherwise to take effect, the Board issued a Notice of Interim Trail Use or Abandonment (NITU). The NITU prevented effectuation of the abandonment-authority approval and thus blocked abandonment—and, as a result, blocked the ending of the railroad's easement, for which abandonment was a necessary condition—for 180 days, during which the railroad could negotiate to try to reach an agreement with two entities that expressed interest in a transfer of the easement for trail use. The NITU expired

on the 180th day when no such agreement was reached. The railroad completed its abandonment three months later.

Ms. Caquelin sued the United States in the Court of Federal Claims, alleging that a taking in violation of the Fifth Amendment's Takings Clause occurred when the government, by issuing the NITU that blocked abandonment, prevented termination of the easement during the 180-day period of the NITU. The trial court granted Ms. Caquelin's motion for summary judgment of liability. *Caquelin v. United States*, 121 Fed. Cl. 658 (2015) (*Caquelin I*). The court relied on our decisions in *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010) (*Ladd I*), *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), and *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006). The parties stipulated to compensation of $900. Deferring the issue of attorneys' fees, the court entered judgment under Court of Federal Claims Rule 54(b).

The government appealed. It argued that this court should overrule at least *Ladd I*, and perhaps also *Caldwell* and *Barclay*. And it argued that a NITU, when not followed by a trail agreement, should not be treated as a categorical taking; instead, either it should be subject to a general regulatory-taking analysis under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), and *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321–24 (2002), or it should be analyzed using the multi-factor approach adopted for government-created flooding in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 38–40 (2012).

Without ruling on the merits of the government's arguments, we remanded for the trial court to receive additional evidence, as needed, and to make findings under an *Arkansas Game* approach, so that consideration of the legal challenges could proceed on a fuller record. *Caquelin v. United*

*States*, 697 F. App'x 1016, 1019–20 (Fed. Cir. 2017) (*Caquelin II*).  On remand, the trial court again held that a taking had occurred.  *Caquelin v. United States*, 140 Fed. Cl. 564 (2018) (*Caquelin III*).

The government appeals.  We affirm.  We reject the contention that *Arkansas Game* calls for displacing the categorical-taking analysis adopted in our precedents for a NITU that blocks termination of an easement, an analysis applicable even when that NITU expires without a trail-use agreement that would indefinitely extend the federal-law blocking of the easement's termination.  We clarify, however, that a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU: in such a case, the NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU.  We leave to future cases further questions about that issue.  Here, the government has not sought a remand for findings on when the railroad would have abandoned the line in the absence of a NITU, and the evidence permits a finding that abandonment would have occurred during the NITU period if the NITU had not issued.

I

A

The Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 476–78, requires a rail carrier that intends to abandon or discontinue a railroad line to file an application with the Surface Transportation Board.  *See* 49 U.S.C. § 10903(a); 49 C.F.R. §§ 1152.20–1152.22.  A rail carrier qualifies for an exemption from certain requirements if it certifies that no local traffic has moved over the line for at least two years and that any overhead traffic can be rerouted over other lines.  49 C.F.R. § 1152.50(b).  The National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208,

97 Stat. 42, 48 (Trails Act), provides for blocking of "abandonment," however, despite the absence of any rail use, present or in prospect, if a proper entity agrees with the railroad to take over the rail right-of-way for trail use. 16 U.S.C. § 1247(d). Such trail use is deemed "interim," *id.*, and the term "rail banking" is applied, 49 C.F.R. § 1152.29(a), because rail use might someday be restored.

When a rail carrier applies for permission to abandon, as relevant here, the Board's regulations provide that any prospective trail sponsor may file a comment indicating an interest "in acquiring or using a right-of-way of a rail line . . . for interim trail use and rail banking." 49 C.F.R. § 1152.29(a). If the rail carrier agrees to negotiate an agreement with such a potential trail sponsor, the Board will issue to the rail carrier and potential trail sponsor a NITU providing for a 180-day negotiation period. *Id.* § 1152.29(d)(1); *see also Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 7 n.5 (1990) (*Preseault I*). Consistent with the limitation of potential outcomes recognized in the full name—"a Notice of Interim Trail Use or Abandonment"—the NITU generally provides that the rail carrier may, during the NITU period, continue the process of physical abandonment, *i.e.*, may "discontinue service, cancel any applicable tariffs, and salvage track and materials." 49 C.F.R. § 1152.29(d)(1); *see also Preseault I*, 494 U.S. at 7 n.5. If the parties reach an agreement, and duly notify the Board, the right-of-way remains under Board jurisdiction indefinitely while used as a recreational trail, and state law may not treat that "interim use . . . as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d); *see also* Government Opening Br. 8 (notification to Board of trail-use agreement "prevents a railroad easement from being abandoned as it might otherwise under applicable law"). If the parties fail to reach an agreement, and the NITU expires, the rail carrier gains authority to abandon; that authority does not mandate abandonment, but if the rail carrier does not exercise the

authority within a one-year period defined by regulation, it cannot abandon without filing a new request for abandonment authority.  49 C.F.R. § 1152.29(d)(1), (e)(2).

In *Preseault I*, the Supreme Court held that, to the extent that the application of the Trails Act results in a Fifth Amendment taking by preventing a property owner from regaining an unencumbered interest in the land subject to a right-of-way, the Tucker Act authorizes suit in the Court of Federal Claims.  494 U.S. at 11–17.  We subsequently held that establishment of a trail under the Trails Act results in a Fifth Amendment taking when the original easement granted to the rail carrier under state property law is not sufficiently broad in scope to encompass recreational trail use.  *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (en banc) (*Preseault II*).

In *Caldwell*, we addressed a statute-of-limitations question, and we "h[e]ld that the Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled."  391 F.3d at 1236; *id.* at 1233 ("The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting.").  We followed that rule in *Barclay*, 443 F.3d at 1373–74.  Later, in *Ladd I*, we applied *Caldwell* and *Barclay*, along with the principle that "physical takings are compensable, even when temporary," 630 F.3d at 1025 (citing *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991)), and held that the Board's issuance of a NITU effects a taking—"when state law reversionary property interests are blocked," *id.* at 1023—even if the rail carrier and potential trail sponsor never reached an agreement, so that no conversion to trail use occurred.  *Id.* at 1022–25.

B

This appeal is the second in this rails-to-trails case, *see Caquelin II*, 697 F. App'x 1016, which involves land now owned by Norma Caquelin in Franklin County, Iowa. The North Central Railway Association, Inc. and its predecessors had held an easement over the land since acquiring the easement by condemnation in 1870. J.A. 201–04; *Caquelin III*, 140 Fed. Cl. at 569. It is undisputed that the railroad's interest was an easement. United States' Pretrial Memorandum of Contentions of Fact and Law at 21, *Caquelin III*, 140 Fed. Cl. 564 (2018) (No. 1:14-cv-00037), ECF No. 50 ("Under Iowa law, the interest acquired in this segment was an easement."); United States' Cross-Motion for Summary Judgment and Memorandum in Support at 1, *Caquelin I*, 121 Fed. Cl. 658 (2015) (No. 1:14-cv-00037), ECF No. 18. It is also undisputed that the easement was limited to rail use and that Norma Caquelin has owned the fee interest in the land subject to the easement since before the Board proceedings began in 2013.

In May 2013, the railroad applied to the Board for authority to abandon the line. J.A. 1332–35. Invoking a provision that exempts qualifying applicants from some requirements for such authority, 49 C.F.R. § 1152.50(b), the railroad certified that it had not run trains over the rail line for at least two years, J.A. 1334. The railroad also certified that the abandonment would be "consummated on or after the effective date of a Board decision." J.A. 1333.

On June 5, 2013, the Board sent a notice to the railroad indicating that, if the Board did not receive a trail-use/rail-banking request under 49 C.F.R. § 1152.29, the exemption would become effective on July 5, 2013, and that the railroad could then abandon the rail line on that date. J.A. 1400; *Caquelin III*, 140 Fed. Cl. at 569–70. In late June, however, the Board received such a request—which the railroad supported—jointly submitted by a city and an organization. J.A. 1391–98; *Caquelin III*, 140 Fed. Cl.

at 570. On July 3, 2013, two days before the abandonment authority was set to take effect, the Board issued a NITU, which prevented the abandonment-authority approval from taking effect and instead gave the railroad 180 days (until December 30, 2013) to negotiate with the city and organization that had expressed interest in sponsoring a recreational trail on the land. J.A. 1403–06; *Caquelin III*, 140 Fed. Cl. at 570. The NITU authorized the railroad, while the NITU was in effect, to "discontinue service and salvage track and related materials," J.A. 1405, and, relatedly, provided that "[i]f no agreement is reached [by December 30, 2013], [the railroad] may fully abandon the line," J.A. 1406. *See Caquelin III*, 140 Fed. Cl. at 570.

The negotiating parties did not reach agreement during the 180-day negotiation period, and when the organization interested in operating a trail sought an extension of the NITU, the railroad declined to consent. *Id.* at 570. The NITU expired on December 30, 2013, and the railroad was authorized to abandon the line. *See id.* The railroad later notified the Board that, as of March 31, 2014, it had "exercised the authority granted [to it by the Board] . . . and fully abandoned the . . . rail line." J.A. 1409; *see Caquelin III*, 140 Fed. Cl. at 570–71.

C

In January 2014, Ms. Caquelin sued the United States in the Court of Federal Claims. We have already described the trial court's initial ruling, our remand for further development, and the trial court's ruling on remand, namely, *Caquelin III. See supra*, pp. 3–4. In that remand ruling, rendered after a trial and now before us, the court summarized how takings doctrine should be applied in various circumstances, *Caquelin III*, 140 Fed. Cl. at 573–78, and, based on that analysis, concluded that the *Arkansas Game* approach is "inapplicable," *id.* at 578. It reiterated its earlier conclusion, which reflected this court's holding in *Ladd I,* that the Board in this case effected a categorical

taking, for the period of the NITU, because the NITU prevented the end of the easement by denying abandonment authority during that time—under governing state law, abandonment is a precondition to extinguishment of railroad easement rights and reversion of easement-free rights to the relevant fee owner. *See* Iowa Code § 327G.76 (2020); *Caquelin III*, 140 Fed. Cl. at 578.

The court went on to apply the *Arkansas Game* approach on the assumption that it legally governed, an assumption we had directed the court to indulge for the sake of completeness of record development and analysis. The court determined that the NITU "blocked [Ms.] Caquelin's reversionary interest in the property . . . for a total period of 180 days," during which time "the NITU deprived [Ms.] Caquelin of *all* use of the land at issue." *Caquelin III*, 140 Fed. Cl. at 579. The court also determined that the Board "issued the NITU with intent to block Ms. Caquelin from any use of the corridor segment while a potential trail use was being negotiated," and that "[t]he very purpose of the [Trails] Act is to effectuate a taking to preserve the option for interim trail use and railbanking." *Id.* at 580. Relatedly, "the result of the NITU was foreseeable, as the very point of a NITU is to prevent a landowner's reversionary interest from taking effect so the trail negotiating process can take place." *Id.* As to the character of the land, and reasonable investment-backed expectations, the court found, "reclamation of the corridor plus tiling could put the land into productive use," *id.* at 581, and such reclamation could have begun in July 2013 without the NITU, *id.* at 582–84. Finally, although the dollar value of use of the land was low, "the NITU act[ed] as a complete interference to the plaintiff's use and enjoyment of their land," which "would have reverted to [Ms.] Caquelin but for the issuance of the NITU." *Id.* at 584.

The government appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error. *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018). Whether a taking has occurred is a question of law based on factual underpinnings. *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). The property rights of the parties in a rails-to-trails case are analyzed under the relevant state's law, which in this case is Iowa law. *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015).

## A

The government accepts that the trial court's judgment is supported by *Ladd I*, but it renews its two arguments that this court should no longer adhere to *Ladd I*. First, it contends, the Supreme Court's decision in *Tahoe-Sierra* requires that the general regulatory-takings analysis of *Penn Central* be applied to assess whether a NITU is a taking when no trail-use agreement has been reached before it expires, and that such a NITU should not be treated as a categorical taking. Second, it contends, at a minimum we should replace the categorical approach with the multi-factor approach of *Arkansas Game*—which shares certain features of the *Penn Central* analysis.

*Ladd I* governs this panel's decision unless we conclude that it has been superseded by an intervening Supreme Court decision. *See*, *e.g.*, *Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019); *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014); *Doe v. United States*, 372 F.3d 1347, 1354 (Fed. Cir. 2004). The only post-*Ladd I* decision of the Supreme Court invoked by the government is *Arkansas Game*. We do not think, however, that *Ladd I* is inconsistent with the decisions on which the government relies, including *Arkansas Game*. In this section, we explain this conclusion. (In the next section of this opinion, we clarify

a point not previously litigated or decided in our cases about when a taking occurs as a result of a NITU.)

1

It is important to identify the nature of the government action at issue. The NITU in this case, as in similar cases, was a government action that compelled continuation of an easement for a time; it did so intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual trail conversion. The government seems to accept, and in any event has not meaningfully contradicted, the foregoing characterization of the NITU as allowing occupation by someone other than the landowner.[1]

It is likewise not meaningfully disputed before us that, if the negotiations for a trail conversion had succeeded, the resulting indefinite federal-law continuation of the

---

[1]    *See Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 104–05 (2014) ("The essential features of easements—including, most important here, what happens when they cease to be used—are well settled as a matter of property law. An easement is a 'nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.' Restatement (Third) of Property: Servitudes § 1.2(1) (1998). 'Unlike most possessory estates, easements . . . may be unilaterally terminated by abandonment, leaving the servient owner with a possessory estate unencumbered by the servitude.' *Id.*, § 1.2, Comment *d*; *id.*, § 7.4, Comments *a, f*. In other words, if the beneficiary of the easement abandons it, the easement disappears, and the landowner resumes his full and unencumbered interest in the land.").

easement would have been a categorical taking, not an action whose evaluation under the Takings Clause requires a multi-factor analysis. *See Ladd I*, 630 F.3d at 1019 ("It is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."). The NITU, which expired without a trail agreement in this case, mandated continuation of the easement for a shorter period, providing a right of occupation by someone other than the landowner and, the trial court found, barring the landowner from using the ground burdened by the easement. *Caquelin III*, 140 Fed. Cl. at 580. *Ladd I*, following *Caldwell* and *Barclay*, along with *Hendler* concerning temporary takings, held that this federal-law maintenance of an easement is a categorical, though temporary, taking, because, for takings-law purposes, it is relevantly the same in character as the longer-duration coerced continuation of an easement that a NITU effects when a trail conversion takes place.

2

This categorical treatment of a coerced easement that impairs the landowner's right to exclude by allowing others' occupation finds support in Supreme Court precedent. *See Preseault I*, 494 U.S. at 24 (O'Connor, J., concurring) ("We recently concluded . . . that a taking would occur if the Government appropriated a public easement." (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–32 (1987))); *Nollan*, 483 U.S. at 832 (a "permanent physical occupation" occurs "where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises"); *Yee v. City of Escondido*, 503 U.S. 519, 522, 523 (1992) (explaining that "[w]here the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires

compensation" and that "[this] category of cases requires courts to apply a clear rule"); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation"; "even if the Government physically invades only an easement in property, it must nonetheless pay just compensation."); *see also Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) ("Without question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred. *Nollan, supra*, 483 U.S. at 831. Such public access would deprive petitioner of the right to exclude others, 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" (quoting *Kaiser Aetna*, 444 U.S. at 176)).

3

*Tahoe-Sierra* did not depart from that treatment of a coerced easement allowing physical occupation. The Court in *Tahoe-Sierra* held that the ordinary regulatory process subject to the *Penn Central* standard includes, as a necessary tool, a temporary moratorium on landowners' development on their own land while the consideration of use-regulation possibilities is underway, and such a moratorium should therefore be subject to a *Penn Central* analysis. 535 U.S. at 321–44. *Tahoe-Sierra* involved neither a government creation or continuation of an easement nor any taking of a comparable recognized land interest to force the landowner to allow others on the land. Indeed, the court introduced its analysis by stressing the "distinction between physical takings and regulatory takings," *id.* at 321, and made clear that its ruling was addressing the latter only—namely, government "regulations that prohibit a property owner from making certain uses of her private property," *id.* at 321–22. The Court reiterated that

"[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner," including when the government takes a leasehold and occupies it even temporarily. *Id.* at 322. The question in *Tahoe-Sierra*, the Court stressed, was not about that, but about government regulations of landowners' own uses of their property. *Id.* at 322–24.

As we ruled in *Casitas Municipal Water District v. United States*, the *Tahoe-Sierra* analysis applies only in a regulatory-taking case. 543 F.3d 1276, 1296 (Fed. Cir. 2008). And as *Ladd I* holds, a NITU like this one does not present a regulatory-takings case. 630 F.3d at 1022–25. Indeed, in the present context, "unless the [Board] attaches postabandonment conditions to a certificate of abandonment, the [Board's] authorization of an abandonment brings its regulatory mission to an end." *Hayfield N. R.R. Co. v. Chicago & N. W. Transp. Co.*, 467 U.S. 622, 633 (1984); *see Preseault I*, 494 U.S. at 21–22 (O'Connor, J., concurring). In the Board's June 5, 2013 notice authorizing abandonment as of July 5, 2013, and in the NITU itself (the Notice of Interim Trail Use *or* Abandonment), the Board confirmed the absence of any federal regulatory interest except, as relevant here, the Trails Act interest in seeking to arrange an indefinite continuation of the easement, *i.e.*, an indefinite taking. As the government acknowledged in the trial court, "[t]he only purpose of the NITU [was] to allow the railroad time to negotiate with a third party regarding railbanking and interim trail use under the Trails Act." United States' Reply in Support of Cross-Motion for Summary Judgment at 2, *Caquelin I*, 121 Fed. Cl. 658 (2015) (No. 1:14-cv-00037), ECF No. 20. Neither in *Tahoe-Sierra* nor any other case cited by the government did the Court treat as a "regulation" subject to the *Penn Central* standard a government action aimed only at securing a coerced easement for others to use the landowner's land.

In short, the purpose of the compelled maintenance of an easement in this NITU situation was simply to try to arrange for a longer-term taking. *Tahoe-Sierra* does not address such a situation. And such a situation does not fall within *Tahoe-Sierra*'s rationale that a moratorium on certain uses of land by the landowner can be a necessary part of the process of making decisions about regulations of landowners' own uses. For those reasons, *Tahoe-Sierra* does not show that *Ladd I* is incorrect.

4

Nor does *Arkansas Game* show that *Tahoe-Sierra* now must be held to provide the governing standard or otherwise show that *Ladd I* is incorrect. In *Arkansas Game*, the Court reversed a ruling of this court that temporary government-induced flooding could not be a taking. 568 U.S. at 31–40. Reiterating its rejection of "the argument that government action must be permanent to qualify as a taking," *id.* at 33, the Court concluded that government-induced flooding was not immune from that principle. The Court explained that a number of facts could bear on whether particular government-induced flooding activities would constitute a taking, *id.* at 36–39, but the Court stated its holding in terms of rejecting a categorical *exemption* from Takings Clause liability: "We rule today, simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Id.* at 38.

We do not think that *Arkansas Game* implies that a non-categorical approach to finding a taking applies to the NITU situation at issue here—a mandated continuation of an easement, not to regulate the landowner's conduct on her land, but only to buy time to arrange a permanent taking by indefinite coerced maintenance of an easement. No such situation was involved in *Arkansas Game* and the Court did not call for a non-categorical approach to such a narrowly defined situation. Indeed, the Court reaffirmed

the recognition of *Tahoe-Sierra* that "'[w]hen the government physically takes possession of an *interest in property* for some public purpose, it has a categorical duty to compensate the former owner.'" *Arkansas Game*, 568 U.S. at 31 (quoting *Tahoe-Sierra*, 535 U.S. at 322) (emphasis added). In addition, the Court, pointing to several categorical-takings cases, stated that "the takings claims approved in these cases were not confined to instances in which the Government took outright physical possession of the property involved." *Id.* at 33.

*Arkansas Game* did not involve government action to maintain a recognized formal legal interest in land (an easement) that limited the landowner's interests, much less an action taken only to buy time to try to arrange a categorical taking. Nor did it involve government authorization of intrusions by persons other than a landowner. Rather, it involved intrusions by water, which the Court made clear form a broad class of situations having quite different characteristics, not neatly classified into subcategories, with many of the possible government-induced flooding actions comfortably characterized as the exercise of regulatory power of a public resource, where the burdens and benefits affect a broad segment of the public. *See id.* at 36–39; *see also* Br. for Respondent at 40–41, 44–45, *Arkansas Game*, 568 U.S. 23 (2012) (No. 11-597), 2012 WL 3680423, at \*40–41, \*44–45. Government-induced flooding therefore comes within the rationale for more flexible takings standards—recognition of "the nearly infinite variety of ways in which government actions or regulations can affect property interests." *Arkansas Game*, 568 U.S. at 31. The NITU situation involved here does not readily come within that rationale.

Finally, as the government has observed in this case, the trial court, in applying the *Arkansas Game* factors pursuant to our remand, relied in large part on the aspects of the NITU that are built into the *Ladd I* treatment of the NITU as a categorical taking. The additional findings

focus on whether the particular portion of land burdened by the easement was capable of being productively used by Ms. Caquelin and when such use would have begun. *See Caquelin*, 140 Fed. Cl. at 581–84. As far as we have been shown, the only identified difference between applying *Arkansas Game* and the categorical-takings analysis is that the former might permit the government to mandate an easement, without giving rise to takings liability, as long as, during the time of the easement, the landowner could or would not have made productive use of the land on which the easement ran. We see nothing in *Arkansas Game*, or in other takings law to which we have been pointed, to support such a result.

We conclude that *Ladd I* remains governing precedent and has not been undermined by *Arkansas Game* in favor of a non-categorical approach.

B

In the course of arguing for a multi-factor approach to the takings question here—an argument we reject for the reasons we have set forth—the government makes one much more limited contention. It suggests that a taking should not be found to have occurred during the period a NITU is in effect if, even in the absence of the NITU, the railroad would not have abandoned its rail line during that period. This causation-based suggestion amounts to a request for a clarification of our case law on the timing of a NITU-based taking, to address a situation not presented or therefore ruled on in the *Caldwell–Barclay–Ladd I* line of cases.

Our discussion of this contention here is appropriately limited. The government does not seek a remand for findings on when the railroad would have abandoned its line had there been no NITU from July 3, 2013 to December 30, 2013. Instead, it makes the legal suggestion just noted and simply asserts that there was no evidence that the railroad would have abandoned its line during that 180-day period

had there been no NITU.  At most, then, the government has presented only a request for a clarification of the legal standard—to incorporate an inquiry into when abandonment would have occurred in the absence of the challenged government action—together with an assertion of evidentiary insufficiency as to whether the railroad would have abandoned its line during the 180-day period.  The precise timing is immaterial to liability if abandonment would have occurred during the NITU period, and there is no issue of damages here.[2]  We agree with the government's legal point but not its assertion of evidentiary insufficiency.

1

It is a fundamental principle of takings law that a government action is not a taking of property if, even in the absence of the challenged government action, the plaintiff would not have possessed the allegedly taken property interest.  *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1359–60, 1362 (Fed. Cir. 2018); *see United States v. Archer*, 241 U.S. 119, 132 (1916).  That causation principle focuses on comparing the plaintiff's property interest in the presence of the challenged government action and the property interest the plaintiff would have had in its absence.  *See Preseault I*, 494 U.S. at 24 (O'Connor, J., concurring) (endorsing the proposition, acknowledged by the government, that "the existence of a taking will rest upon the nature of the state-created property interest that [the landowners] would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest").  It reflects a causation principle hardly unique to takings law.  *See, e.g., Babb v. Wilkie*, 140 S. Ct. 1168,

---

[2]    For example, it is immaterial here that there was a short gap between the date of issuance of the NITU (July 3, 2013) and the date on which the Board's grant of abandonment authority would have taken effect (July 5, 2013) had no NITU issued.

1178 (2020) (explaining general but-for rule governing damages and certain other result-altering relief).

The application of that causation principle to the NITU situation at issue is straightforward. The challenged government action is the legally mandated maintenance of the easement through denying abandonment authority to the railroad. It is undisputed that, without abandonment by the railroad, the easement would remain. It follows that the NITU would not have altered the continuation of the easement during the NITU period—*i.e.*, would not have caused the only alleged taking of property—if the railroad would not have abandoned the rail line during that period even in the absence of the NITU.

The government stated at oral argument that our line of cases on NITUs and takings, growing out of *Caldwell*, does not foreclose applying the general causation principle in just this way. We agree. To begin with, this line of cases grows out of and seeks to follow *Caldwell*, and the concluding statement of the holding in *Caldwell* by its terms incorporates this causation inquiry: "We hold that the Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law *reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled*." *Caldwell*, 391 F.3d at 1236 (emphasis added). The court used similar language at the outset of its analysis, stating that "when a railroad right-of-way is converted to interim trail use," the taking, if any, occurs "when state law reversionary property interests *that would otherwise vest* in the adjacent landowners are *blocked from so vesting*." *Id.* at 1233 (emphases added). This language incorporates the causation inquiry we have described. In *Barclay*, this court repeated the "would otherwise vest" language from *Caldwell*, *see Barclay*, 443 F.3d at 1373, and it subsequently explained that one of the plaintiffs admitted that, "after issuance of the NITU, 'the easement continued in existence beyond the time when it otherwise would have been abandoned,'"

concluding: "*Thus*, the NITU triggers accrual," *id.* at 1374 (emphasis added).  And in *Ladd I*, this court quoted the "otherwise would have been abandoned" language from *Barclay* in describing the legal rule being followed.  630 F.3d at 1021.

It is true that other language in *Caldwell*, *Barclay*, and *Ladd I* uses a shorter formulation referring simply to the NITU date as the date of taking.  *See, e.g.*, *Caldwell*, 391 F.3d at 1235 ("We therefore hold that the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued."); *Barclay*, 443 F.3d at 1378; *Ladd I*, 630 F.3d at 1020.  But that language is better read so as not to run counter both to the fuller formulation and to basic causation principles.  It can be read as a shorthand that applies where no party has pointed to any legally material difference between the NITU date of issuance (or expiration) and a date of abandonment in the but-for world in which there was no NITU.  That was true in *Caldwell*, and it was also true in the follow-on cases of *Barclay* and *Ladd I*: nothing in those opinions suggests that a party in those cases argued to this court that, even in the absence of the NITU, the railroad would not have abandoned the rail line until some date that would make a difference to the outcome of the issue on appeal—whether timeliness, in *Caldwell* and *Barclay*, or liability for a taking, in *Ladd I*.  In that situation, the shorthand formulation simply reflects the lack of any difference in the case between the shorter formulation and the fuller formulation.  Its presence in the cases should not erase the fuller formulation where the difference matters.

These are circumstances calling for application of the principle that prior decisions do not establish controlling precedent on an issue "never squarely addressed." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see, e.g.*, *Arthrex, Inc. v. Smith & Nephew, Inc.*, 880 F.3d 1345, 1349 (Fed. Cir. 2018).  We recognized and applied that principle in *Ladd v. United States* (*Ladd II*), where we held that the

statement of the accrual rule in *Caldwell* and *Barclay* does not control where the facts give rise to an issue of suspending the accrual, because "[n]either case addressed whether and under what circumstances the claim accrual suspension doctrine should apply in Trails Act cases" and "there is no indication that the landowners in those cases" met the conditions for suspension.   713 F.3d 648, 654 (Fed. Cir. 2013).   The principle is especially applicable where the foundational case prominently states its holding in terms that already do account for the causation inquiry that is part of takings law.  We conclude, therefore, that there is no taking until the time as of which, had there been no NITU, the railroad would have abandoned the rail line, causing termination of the easement that the NITU continued by law.

We decide no more on the doctrinal issue.  Other questions could well arise in the future, such as questions about whether the plaintiff or the government has the burden of production or persuasion on what the railroad would have done if there had been no NITU.  With no request from the government for a remand for further proceedings on the but-for-NITU issue in this case, we do not address such questions here.

2

The government suggests that there is insufficient evidence to support a finding that the railroad would not have abandoned the line at issue between July 3, 2013 and December 30, 2013, even if no NITU had issued.  We reject the suggestion.  The government does not point to any evidence at all affirmatively indicating that the railroad would have delayed abandonment past December 30, 2013, had there been no NITU to interfere with the grant of authority of abandonment that was set to take effect on July 5, 2013.  In the absence of any such evidence, there is no clear error in a contrary finding on the evidence of record in this case.

The railroad filed an application to abandon, indicating an affirmative intent to abandon.  When it was asked for consent to an extension of the December 30 expiration date, it refused, confirming an interest in abandoning sooner rather than later (in the absence of a promising negotiation for a trail agreement).  It completed the abandonment just three months after December 31, 2013, the date on which it became legally authorized to abandon the line, suggesting a comparable time period had authority been granted as of July 5, 2013.  The statute itself provides generally for authorization to remove track during the NITU, an authorization that was included in the NITU here, suggesting an expectation of comparatively prompt completion of abandonment.  And there was evidence that the railroad in this case did remove track in 2012 or 2013, *see* J.A. 282, a precondition to abandonment-based easement termination under Iowa law, Iowa Code § 327G.76.  In the absence of contrary evidence, this evidence suffices to support an inference that, had there been no NITU, the railroad would have completed abandonment during the period in which the NITU was in effect.

### III

For the foregoing reasons, we affirm the judgment of the Court of Federal Claims.

The parties shall bear their own costs.

**AFFIRMED**