# United States Court of Appeals for the Federal Circuit

---

**SAUER WEST LLC, ET AL.,**
*Plaintiffs-Appellants*

**MAPLEWOOD ACRES, INC., RONALD KLEIN,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2024-1114

---

Appeal from the United States Court of Federal Claims in No. 1:12-cv-00340-RTH, Judge Ryan T. Holte.

---

Decided: August 14, 2025

---

REED W. RIPLEY, Stewart, Wald & Smith, LLC, Kansas City, MO, argued for plaintiffs-appellants. Also represented by THOMAS SCOTT STEWART.

BRIAN R. HERMAN, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TODD KIM.

---

Before DYK, SCHALL, and CHEN, *Circuit Judges*.

DYK, *Circuit Judge*.

Plaintiffs, landowners in Colorado, brought suit against the United States, seeking compensation for an alleged temporary taking pursuant to the National Trail Systems Act, 16 U.S.C. § 1247(d), based on the issuance of a Notice of Interim Trail Use ("NITU") by the Surface Transportation Board ("STB"). The Court of Federal Claims ("Claims Court") granted the government's motion for summary judgment, concluding that the plaintiffs failed to prove that the issuance of the NITU in the circumstances was the cause of a taking. *See Sauer W., LLC v. United States*, 168 Fed. Cl. 49, 83 (2023) ("*Sauer I*"). We affirm.

BACKGROUND

I

The federal government has regulated the nation's rail system since the Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). In the Transportation Act of 1920, Pub. L. No. 66-152 § 439, 41 Stat. 456–57, 495, Congress conferred exclusive jurisdiction over the rail system on the Interstate Commerce Commission, now the Surface Transportation Board ("STB"). *See* 49 U.S.C. § 10501(b). A railroad that wishes to abandon any portion of a railroad line that it operates must file an application with the STB for permission to abandon. *See id.* § 10903(a)(1).

If the STB authorizes a railroad to abandon, the railroad is not compelled to abandon the line. Should the railroad choose to proceed with the process of abandonment, it must file a notice of consummation with the STB "to signify that it has exercised the authority granted and fully abandoned the line" within one year of the authorization. 49 C.F.R. § 1152.29(e)(2). If the carrier does not file a notice

of consummation by the deadline, its abandonment authority automatically expires, and it must file a new application with the STB if it later wishes to abandon the line.  *See id.*

In 1983, the National Trails System Act Amendments, Pub. L. No. 98-11, 97 Stat. 42 (the "Trails Act") was enacted as a measure "to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails."  *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 6 (1990) ("*Preseault I*").  Section 8(d) allows a railroad to negotiate with a "[s]tate, political subdivision, or qualified private organization [that] is prepared to assume full responsibility for management of [a] right[]-of-way" for use as a recreational trail.  16 U.S.C. § 1247(d).  If the parties agree, the railroad's right-of-way is transferred to a trail sponsor for interim recreational trail use.  The trail use is "interim" because of the possibility that the railroad may in the future resume use of the right-of-way for railroad purposes. *See id.*

The STB's regulations implementing section 8(d) describe the process for abandonment and provide that, after a railroad has filed an application for abandonment, any prospective public or private trail sponsor may file a comment, request, or petition indicating its interest "in acquiring or using a right-of-way of a rail line . . . for interim trail use and rail banking."  49 C.F.R. § 1152.29(a).  If the railroad agrees to negotiate with the prospective trail sponsor, the STB issues a Notice of Interim Trail Use or Abandonment ("NITU"), which suspends abandonment proceedings for one year to allow the prospective rail sponsor to enter into an agreement with the railroad to operate the right-of-way as a recreational trail.  *Id.* § 1152.29(d)(1).  A NITU will generally permit the railroad to continue the process of abandoning the railroad line during the one-year negotiation period, such as by "discontinu[ing] service,

cancel[ling] any applicable tariffs, and salvag[ing] track and material." *Id.*

If the parties do not come to a trail use agreement, the railroad may abandon the railroad line within one year from the date of the NITU's issuance, but, as is generally the case, the railroad is not required to abandon the line. *Id.* § 1152.29(e)(2). In the typical case, the railroad does not own its right-of-way outright but rather holds it under easement. The easement usually provides that the property reverts to abutting landowners upon abandonment of rail operations. *See Preseault I*, 494 U.S. at 8. The easement may also sometimes be broad enough in scope to encompass other uses, such as the recreational trail use.

## II

In *Preseault I*, the Supreme Court held that the application of section 8(d) may give rise to a taking by preventing an abutting property owner from regaining their unencumbered interest in the land. 494 U.S. at 8. We subsequently held that establishment of interim trail use results in a Fifth Amendment taking if the original right-of-way easement conveyed to the railroad was not sufficiently broad as a matter of state law to encompass recreational trail use. *Preseault v. United States*, 100 F.3d 1525, 1552 (Fed. Cir. 1996) ("*Preseault II*") (en banc) (plurality opinion). We announced a three-factor test to determine whether intermittent trail use divests a landowner of an easement that would have otherwise vested in the landowner as a matter of state law:

> (1) [W]ho owned the strips of land involved, specifically did the Railroad by the . . . transfers acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants

of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

*Id.* at 1533.

In *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), we clarified that a taking occurs only if, as a result of the issuance of a NITU, "state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting," i.e., when the "state law reversion interests [are] forestalled by operation of . . . the Trails Act[.]" *Id.* at 1233. We explained that the "NITU operates as a single trigger to several possible outcomes": it may result "in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked," whereas it may result in a temporary taking when negotiations fail "and the NITU . . . then convert[s] into a notice of abandonment." *Id.* at 1234; *accord Behrens v. United States*, 59 F.4th 1339, 1343 (Fed. Cir. 2023); *Castillo v. United States*, 952 F.3d 1311, 1315 (Fed. Cir. 2020).

We subsequently held in *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020), that a plaintiff must also establish that the issuance of a NITU caused the taking. *Id.* at 1372–73. The inquiry that *Caquelin* requires is (1) whether the NITU delayed the railroad's abandonment of the line that it would have otherwise completed, postponing the reversion of the easement to the landowner, or (2) whether the NITU merely created an opportunity for the railroad to enter into a trails agreement, absent which the railroad would not have abandoned the line. *Id.* at 1373. In other words, the question is whether the NITU was the cause of any delay in the reversion of the easement

to the landowner.  Only in the former situation is the issuance of a NITU a taking.

## III

The railroad line here (the "Line") is owned by Great Western Railway of Colorado, LLC ("Great Western") and extends 6.2 miles between Johnstown, Colorado, and Welty, Colorado.  Great Western's predecessor-in-interest constructed the Line to transport sugar beets from a sugar beet dump facility in Welty to the railroad's main facilities in Johnstown.  The sugar beet dump facility was closed in the 1970s, and local and overhead traffic on the Line ceased.  Thereafter, Great Western used the Line for railcar storage, and the Line fell into a state of disrepair.  The easement granted by the abutting landowners encompassed only railroad use and did not involve any recreational uses.

On April 16, 2008, Great Western formally requested abandonment of the Line by filing a Notice of Exemption with the STB.  The STB granted permission for Great Western to abandon the Line on May 6, 2008, and subsequently issued a NITU on July 28, 2008, so that Great Western and the Town of Johnstown, Colorado, could negotiate for a possible interim trail use agreement.  While interim trail negotiations were ongoing, Great Western undertook a tie replacement project, replacing 700 relay ties, switch ties, and spikes and utilized the Line for storage purposes.  Negotiations were ultimately unsuccessful, and the NITU expired on December 2, 2008.  Rather than consummating abandonment, Great Western requested and received six consecutive one-year extensions beginning in May 2009, each time stating that it was exploring alternatives to abandonment.  On August 28, 2014, about nine months before its abandonment authority was set to expire, Great Western notified the STB that it had decided not to abandon the Line.

IV

On May 30, 2012, the plaintiffs-appellants (collectively, "Sauer"), which owned property along the Line subject to Great Western's railroad easement, sued the United States in the Claims Court, alleging that the STB's issuance of the NITU constituted a temporary Fifth Amendment taking. The parties subsequently cross-moved for summary judgment and submitted a joint statement of facts.

In a thorough opinion and order, the Claims Court granted the government's motion for summary judgment and denied Sauer's motion. The Claims Court found that Sauer had not established causation under *Caquelin* because "[t]he actions of [Great Western] strongly indicate it would not have abandoned the line at the time of the NITU." *Sauer I*, 168 Fed. Cl. at 73. It further held that it was irrelevant whether Great Western had abandoned its easement prior to the NITU as a matter of state law because the original easement was not broad enough to encompass recreational trail use. *Id.* at 83.

Sauer appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review a decision of the Claims Court granting summary judgment de novo. *Rogers v. United States*, 814 F.3d 1299, 1305 (Fed. Cir. 2015). We review the Claims Court's legal conclusions de novo, while reviewing its factual findings for clear error. *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018). Whether a taking has occurred is a question of law based on factual underpinnings. *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). The parties agree that there are no facts in dispute.

## I

Sauer argues that we should refer this case for initial hearing en banc pursuant to Rule 35(a) to overrule our previous decision in *Caquelin* that the plaintiff in a rails-to-trails case must show that the railroad would have abandoned a rail line in the absence of a NITU. Sauer argues that the NITU's issuance by itself constitutes a per se taking and that a "categorical physical taking begins when the STB issues the NITU." Appellants' Br. 15.

Sauer's theory is that the mere authorization to enter into a trails agreement constitutes a taking based on the Supreme Court's decision in *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). *See* Appellants' Br. 29–31. But mere authorization to seek access to property is not a taking unless it is coupled with compulsion directly to the property owner. *See Dinh v. United States*, No. 23-2100, Slip Op. at 11 (July 31, 2025). In *Cedar Point*, it was not the authorization for third parties to enter the land but rather the requirement that the landowner allow such entry that constituted a taking. 594 U.S. at 162. So, here, it is not the authorization for the railroad to enter into a trails agreement that constitutes a taking but rather the bar to abandonment that the NITU creates. That bar to abandonment is the cause of non-abandonment only if the railroad would have otherwise abandoned the railroad easement.

Sauer also urges that *Caquelin* is inconsistent with our decisions in *Caldwell*; *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006); and *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010). As discussed earlier, in *Caldwell*, we affirmed the dismissal of the plaintiffs' takings claim as barred by the Tucker Act's six-year statute of limitations. There, the plaintiffs argued that a taking under the Trails Act does not accrue for the purposes of the statute of limitations until the railroad right-of-way is actually converted into a trail for interim trail use. *Caldwell*, 391 F.3d

at 1233. We disagreed, explaining that the taking, if any, occurs once "state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Id.* The only government action that effectuates this blocking, we explained, is the issuance of the NITU, since the task of finalizing the trail use agreement "falls entirely on the railroad and trail operator." *Id.* at 1233–34.

In *Barclay*, we rejected the plaintiffs' argument that *Caldwell* was wrongly decided and should be overruled "insofar as it relied on federal rather than state law to determine when abandonment and reversion of railroad rights-of-way occur." 443 F.3d at 1373. We explained that "[a]bandonment cannot occur until authorized by federal law, and the NITU precludes abandonment and the reversion that would follow if abandonment were consummated." *Id.* at 1374.

In *Ladd*, we reversed a decision by the Claims Court holding that the issuance of a NITU amounts to a compensable taking only if the easement is actually transferred to a third-party trail sponsor for recreational trail use. 630 F.3d at 1018. Explaining that we were bound by our decisions in *Caldwell* and *Barclay*, we held that the issuance of the NITU in that case constituted a taking, explaining that a taking was compensable whether it was permanent or temporary. *Id.* at 1025.

In *Caquelin*, we considered our decisions in *Caldwell*, *Barclay*, and *Ladd* and explained that these cases establish that a Fifth Amendment taking is "accomplished when a[] NITU is issued and state law <u>reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled</u>." *Caquelin*, 959 F.3d at 1371 (emphasis in original) (quoting *Caldwell*, 391 F.3d at 1236). In other words, for there to be a cognizable taking, the plaintiffs must show that the issuance of the NITU

delayed the railroad's abandonment, after which their state-law reversionary interests would have otherwise vested.

As we explained in *Caquelin*, our prior cases simply did not address the issue whether the issuance of a NITU was a per se taking and instead "use[d] a shorter formulation referring simply to the NITU date as the date of taking." 959 F.3d at 1372. We explained that "nothing in those opinions suggests that a party in those cases argued to this court that, even in the absence of the NITU, the railroad would not have abandoned the rail line until some date that would make a difference to the outcome of the issue on appeal." *Id.* Because *Caquelin* is consistent with our prior cases and in our view was correctly decided, we decline to refer proceedings for initial en banc hearing.

## II

Sauer alternatively argues that it satisfied *Caquelin*'s causation requirement. Sauer argues that the causation standard announced in *Caquelin* "[n]ecessarily" focuses on the railroad's intent as of the time of the NITU's issuance and that "the NITU itself strongly evidences an intent to abandon." Appellants' Br. 35, 38. However, *Caquelin* held that the issuance of a NITU is not alone sufficient to establish that the government caused a taking. 959 F.3d at 1363. Although the railroad's intent at the time of the NITU's issuance is probative as to the ultimate question whether it would have consummated abandonment in the absence of the NITU, it does not establish causation as Sauer suggests. Here, the Claims Court properly found that the totality of circumstances does not suggest causation.

In *Caquelin*, we identified five pieces of evidence in the record in that case that demonstrated that the plaintiffs had carried their burden of establishing causation—(1) the railroad requested abandonment; (2) the railroad refused

to consent to an extension of the NITU; (3) the railroad abandoned the railroad line within three months of the NITU's expiration; (4) the NITU authorized the railroad to remove tracks during the pendency of the NITU period; and (5) the railroad in fact removed tracks. *Caquelin*, 959 F.3d at 1373. Because the government had not "point[ed] to any evidence at all affirmatively indicating the railroad would have delayed abandonment . . . had there been no NITU to interfere with the grant of authority of abandonment that was set to take effect," we concluded that the Claims Court did not err in determining that the plaintiffs had established causation. *Id.*

We note that both parties appear to treat our decision in *Caquelin* as articulating a five-factor test. Although we found five factual indicia relevant to our analysis in *Caquelin*, neither *Caquelin* nor our decisions thereafter have purported to establish a rigid multi-factor test. For example, in *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022), we considered a variety of evidence, such as (1) the railroad's intent to abandon prior to the NITU's issuance, (2) the railroad's removal of rails and ties during the pendency of the NITU, (3) the railroad's intent to either consummate abandonment or enter into a trail-use agreement after the NITU expired, and (4) the railroad's ultimate abandonment of the line. *See id.* at 145.

The Claims Court here acknowledged that facts of this case were quite different from those in *Caquelin*, ultimately concluding that the five factors were on balance "inconclusive or neutral evidence of causation." *Sauer I*, 168 Fed. Cl. at 68.[1] There was other evidence beyond the

---

[1]    On appeal, the government urges that we should hold that Sauer cannot establish causation because Great Western was prohibited from removing tracks during the

factors that Great Western would not have abandoned, such as its six one-year extensions to negotiate the trails agreement, improvements to the Line, the fact that no track was removed, the use of the line for railcar storage, negotiations with other parties to reopen the Line, and eventual decision not to abandon. On this record, we cannot say that the Claims Court erred in determining that Sauer failed to adduce sufficient evidence to support causation. *See Memmer*, 50 F.4th at 145. The Claims Court, based on evidence in the record, correctly concluded that the government had demonstrated that Great Western would not abandon the Line in the absence of the NITU.

## III

Finally, Sauer argues that under *Preseault II*, a plaintiff may establish takings liability by showing that the railroad abandoned its railroad right-of-way as a matter of state law prior to the NITU's issuance. That is not correct. State law abandonment only plays a role in the analysis if there is a dispute about whether the railroad's easement extends beyond railroad use to recreational use. In those circumstances, state law determines whether the scope of the easement was broad enough to encompass recreational trail use. The question of abandonment of a railroad easement is governed by federal, rather than state, law.

As we explained in *Barclay*, "[w]hile state law generally creates the property interest in a railroad right-of-way, 'the disposition of reversionary interests [is] subject . . . to the [STB's] "exclusive and plenary" jurisdiction to regulate

---

period of an order pursuant to the National Historic Preservation Act. *See* Appellee's Br. 33. Because we agree with the Claims Court that there was sufficient evidence demonstrating that Great Western would have delayed abandonment, with or without the NHPA order, we need not decide this issue.

abandonments' of railroad rights of way." 443 F.3d at 1374 (alterations in original) (footnote omitted) (quoting *Preseault I*, 494 U.S. at 8, 16). Similarly, in *Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009), we explained that the trial court should consider "either the scope of the easement granted . . . or, if the scope was broader than railroad use, whether in this case the easement was abandoned." *Id.* at 1373. We see no reason to depart from our prior decisions, especially since the purpose of the Trails Act was to provide a comprehensive federal regulatory scheme for the abandonment of railroad rights-of-way. As to abandonment of railroad use, the STB retains exclusive authority under federal law. *Chicago & N.W. Transp. Co.*, 450 U.S. at 323 ("Congress granted to the [STB] plenary authority to regulate, in the interest of interstate commerce, rail carriers' cessations of service on their lines. And at least as to abandonments, this authority is exclusive."); *see also Preseault I*, 494 U.S. at 8.

The plurality opinion in *Preseault II* is clear on its face that state law is only implicated if the easement is broad enough to cover recreational use.[2] We first concluded that, under state law, the "shifting public use" doctrine did not operate to widen the scope of the easement in that case from railroad use to recreational use. 100 F.3d at 1541–44. We then addressed state-law abandonment, only "assuming for sake of argument . . . that the so-called 'doctrine of

---

[2]    Sauer also relies on our decisions in *Ellamae*; *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005); and *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004) for the proposition that state-law abandonment is an "alternative path" to liability. *See* Appellants' Br. 48–50; Appellants' Reply Br. 25. In those cases, however, we explained that state-law abandonment is only relevant if the scope of the railroad's easement includes recreational trail use. *See Ellamae*, 564 F.3d at 1373; *Toews*, 376 F.3d at 1377–79.

14                                                                                  SAUER WEST LLC v. US

shifting public use' is available," to explain that, even if the scope of the easement encompassed recreational use, that easement had been abandoned under state law. *Id.* at 1544–46. We did not conclude that state-law abandonment could apply to an easement limited in scope to railroad use.

Here, Sauer concedes that Great Western's right-of-way easement was limited to railroad use. *See* Appellants' Br. 7. It is thus irrelevant whether as a matter of state law Great Western could have abandoned the Line, since under federal law, it would have had to seek permission from the STB to consummate abandonment in any case.

Finally, to the extent that Sauer contends that federal preemption of state-law abandonment of the railroad easements itself results in a taking, *see* Appellants' Br. 53–54, their claim is barred by the statute of limitations. As the government explains in its response brief, the federal government's preemption of state law comes from the Transportation Act of 1920, so any takings claim would be time-barred. *See* Appellee's Br. 49–50.

CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the judgment of the Claims Court granting summary judgment to the government.

**AFFIRMED**